**Gene R. MILLER, President, United Transportation Union Local 887, Plaintiff,**

**v.**

**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Defendant.**

**Court No. 81–7–00855.**

United States Court of International Trade.

Sept. 26, 1985.

Collins, Collins & Dinardo, P.C., Buffalo, N.Y. (Michael H. Doran, Buffalo, N.Y., on the brief), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C. (Shiela N. Ziff, Washington, D.C., on the motion), for defendant.

RE, Chief Judge:

In this action, plaintiff, on behalf of former employees of the Butte, Anaconda & Pacific Railway Company, seeks review of a final determination by the Secretary of Labor which denied certification of eligibility for benefits under the worker adjustment assistance program of the Trade Act of 1974, tit. II, §§ 221–249, 284, 19 U.S.C. §§ 2271–2321, 2395 (1982). Specifically, the Secretary found that the workers were not eligible for assistance because an increase in imports did not contribute importantly to the closing of either Anaconda Copper Company's smelter or refinery, and thus did not contribute importantly to the railway workers' separation from employment.

After reviewing the administrative record and the arguments of the parties, the court holds that the Secretary's denial of certification is supported by substantial evidence and is in accordance with law. Therefore, the determination of the Secretary is affirmed.

On October 3, 1980, plaintiff, on behalf of former employees of the Butte, Anaconda and Pacific Railway Company of Anaconda, Montana (Railway), filed a petition for certification of eligibility to apply for trade adjustment assistance benefits. Pursuant to section 221(a) of the Trade Act of 1974, 19 U.S.C. § 2271(a), the Office of Trade Adjustment Assistance (OTAA) of the Department of Labor [1] published a notice in the *Federal Register* stating that it had received a petition and instituted an investigation. 45 Fed.Reg. 75,368 (1980).

Section 222 of the Act requires the Secretary to certify a group of workers as eligible to apply for trade adjustment assistance benefits if it is determined:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

Trade Act of 1974 § 222, 19 U.S.C. § 2272 (1982).

Plaintiff contends that increased imports of copper contributed importantly to the decline of sales and production by petitioner's employing firm, and to the eventual separation from employment of the Railway workers.

On November 23, 1976, the Railway workers were certified by the Secretary as eligible for trade adjustment assistance benefits. The certification was based upon the Secretary's finding that a decrease in tonnage hauled by the Railway, attributable to Anaconda Copper's increased purchases of imported copper ore concentrate, contributed importantly to the Railway workers' separation from employment. *See* 41 Fed.Reg. 53,551 (1976). This certification expired on November 23, 1978. A subsequent application for benefits was denied on May 2, 1980 because of increases of tonnage hauled during 1979 and the first 2 months of 1980. 45 Fed.Reg. 30,742, 30,-744 (1980).

The OTAA's investigation disclosed that the Anaconda Copper Company is a vertically integrated mineral producer engaged in the mining, processing, and manufacturing of nonferrous minerals, principally copper and uranium. The company, a division of Anaconda Company, which is a subsidiary of Atlantic Richfield Company, operates copper mines both domestically and abroad. Until September 29, 1980, Anaconda maintained a smelter and refinery in Montana, which processed copper from Anaconda's domestic mines, and copper supplied by outside or "toll" customers. An industry-wide strike by domestic miners of copper ore forced the closing of both facilities on July 1, 1980, and, although the strike was ultimately settled, neither the smelter nor refinery resumed operation.

The Butte, Anaconda & Pacific Railway Company is a wholly owned subsidiary of Anaconda Copper Company. Over 98 percent of the Railway's freight is hauled for the Anaconda Copper Company. The Railway's principal business is the transportation of copper precipitates, concentrates, and by-products from domestic mines to the smelter in Anaconda, Montana, and blister copper to the refinery in Great Falls, Montana. The Railway has 26 miles

---

1. The Office of Trade Adjustment Assistance (OTAA) of the Department of Labor has been delegated the responsibility for investigating worker adjustment assistance programs. 29 C.F.R. § 90.2 (1984).

of mainline track and 100 miles of siding track between Butte and Anaconda. The smelting process converts copper ore into "blister" copper of 99 percent purity, which is cast into copper anodes for electrolytic refining. When the smelter was operational, the anodes were transported by the Railway to the refinery and processed into copper cathodes.

The Railway workers did not participate in the strike that caused the closing of Anaconda's smelter and refinery. Nevertheless, the workers were separated from employment because the miners' strike effectively halted the Railway's business. Stating that their continued operation was unprofitable, on September 29, 1980, Anaconda Copper Company announced the permanent closing of both the smelter and refinery. As the primary reason for closing the plants, the Company cited the high costs that would be required to comply with the Clean Air Act, state pollution laws, and OSHA safety regulations. Since ore obtained from the Butte mining operations contained sulfur and higher-than-normal amounts of arsenic, Anaconda determined that an "economic engineering solution to the problem [was] infeasible." Anaconda stated that it would cost approximately four hundred million dollars to make the plants comply with federal and state environmental and health laws.

After the Company closed the smelter and refinery, it contracted with two Japanese companies for the overseas processing of Anaconda's copper concentrates. Under the 7-year contract with the Japanese firms, which became effective on January 1, 1981, Anaconda will supply 390,000 metric tons per year, which amounts to approximately 80 percent of Anaconda's mine production. The OTAA's investigation anticipated that approximately 50 percent of the copper sent to Japan would be processed on a toll basis for Anaconda and ultimately returned to the United States, and that the remainder would be purchased by the Japanese companies.

The OTAA performed a trade and industry analysis pertaining to the effect of imports on the domestic copper industry. The investigation focused on imports of copper ore, blister copper, and refined copper. In 1978, imported ore amounted to less than 2 percent of domestic production. Imports of copper ore increased 21.4 percent in 1979 and 171.4 percent during the first three quarters of 1980. Imports of blister copper decreased 70.3 percent in 1979 from a 5-year high attained in 1978. The January through September 1980 period saw imports of blister copper increase 62.5 percent. Finally, the investigation disclosed that imports of refined copper, which had steadily increased since 1975, decreased 50.0 percent in 1979. In 1980, however, imports increased 103.8 percent. The import-to-consumption ratio for refined copper was 10.0 percent during the first three quarters of 1979 and 19.8 percent for 1980. The Anaconda Copper Company did not import refined copper at any time from 1978 through 1980.

The OTAA conducted a survey of Anaconda's customers, including its toll customers, in order to determine whether increased imports of copper contributed importantly to the workers' separation from employment. The survey disclosed that none of Anaconda's toll customers who responded to the survey had copper refined abroad during the period from 1978 to October 1980. Of the 58 non-tolling customers who responded, 18 reported purchases of imported copper. The survey revealed, however, that of the "customers who reduced purchases of refined copper from Anaconda and increased purchases of imported refined copper, the majority also reported increased purchases from other domestic sources." 46 Fed.Reg. 20,323 (1981).

Based on these findings, the Secretary concluded that, since increased imports were not an important factor in the separation of the Railway workers, the workers should be denied eligibility for assistance. Although the Secretary recognized that Anaconda's toll copper would be imported to the United States in the latter part of 1981, he stated that the "magnitude of

these future imports is indeterminable at present since the Japanese might purchase a substantial portion of the concentrates for use in Japan and the Far East." 46 Fed.Reg. 20,323 (1980).

Thereafter, plaintiff applied for reconsideration of the administrative determination. In support of its application, plaintiff submitted a preliminary report prepared by the Environmental Protection Agency (EPA), which discussed the role of environmental laws in Anaconda Copper Company's decision to close its smelter and refinery. The plaintiff claimed that the report provided "evidence of foreign competition on the United States copper market." 46 Fed. Reg. 25,164 (1981). The Secretary determined that "[t]he EPA report, although providing some interesting aspects of the Clean Air Act's role in ARCO's decision to close its Anaconda Copper's Montana smelting and refining operation, does not provide new evidence to support the petitioner's claim that increased imports contributed importantly to the closure." *Id.* at 25,163. Thus, the request for reconsideration was denied. Subsequently, by letter complaint, plaintiff commenced this action seeking judicial review of the Secretary's final negative determination.

Section 284 of the Trade Act of 1974 empowers the Court to review a decision by the Secretary of Labor which denies certification of eligibility for trade adjustment assistance benefits to assure that the determination is supported by substantial evidence in the administrative record and is in accordance with law. 19 U.S.C. § 2395(c) (1982); 28 U.S.C. § 2640(c) (1982); *see Woodrum v. Donovan*, 5 CIT 191, 193, 564 F.Supp. 826, 828 (1983), *aff'd*, 737 F.2d 1575 (Fed.Cir.1984). The findings of fact by the Secretary of Labor shall be conclusive if supported by substantial evidence. Trade Act of 1974 § 284(b), 19 U.S.C. § 2395(b) (1982).

Plaintiff argues that the Secretary's negative determination of eligibility should be set aside. In essence, plaintiff challenges the nature and extent of the Secretary's investigation. Specifically, plaintiff alleges

that he was denied a meaningful opportunity to be heard at a public hearing, that the Secretary's investigation was cursory and insufficient, and that the Secretary improperly concluded that increased imports did not contribute importantly to the workers' separation from employment.

Section 221 of the Trade Act of 1974 requires the Secretary to conduct a public hearing upon request of persons found by the Secretary to have a substantial interest in the proceedings. 19 U.S.C. § 2271 (1982). Pursuant to section 221, the hearing must be requested within 10 days after the date of the Secretary's publication in the *Federal Register* of the notice of receipt of the petition. *Id.* In this case, plaintiff does not dispute that the Secretary complied with the publication requirements of section 221. Rather, plaintiff asserts that there is procedural error because the Secretary failed to give actual notice of the opportunity to request a hearing.

■ It is well established that "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), *quoted in Goldberg v. Kelly*, 397 U.S. 254, 259, 267, 90 S.Ct. 1011, 1015, 1020, 25 L.Ed.2d 287 (1970); *see Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). Adequate notice of the opportunity to request a hearing is an element of the fair-hearing requirement of the due process clause. *See Atkins v. Parker*, — U.S. ——, 105 S.Ct. 2520, 2525–27, 86 L.Ed.2d 81 (1985). It must be noted, however, that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly, supra*, 397 U.S. at 268–69, 90 S.Ct. at 1020–21. Accordingly, the court may determine whether the administrative procedures pro-

vided by the Secretary "provide all the process that is constitutionally due." *Mathews v. Eldridge, supra,* 424 U.S. at 333, 96 S.Ct. at 901.

■ It is well settled that "because of the *ex parte* nature of the certification process, and the remedial purpose of the trade adjustment assistance program, the Secretary is obliged to conduct his investigation with the utmost regard for the petitioning workers." *Local 167, International Molders and Allied Workers' Union v. Marshall,* 643 F.2d 26, 31 (1st Cir.1981). This is particularly true when workers appear *pro se* before the Secretary. *See Estate of Finkel v. Donovan,* 9 CIT ——, ——, 614 F.Supp. 1245, 1249 (1985). In *Estate of Finkel,* a petitioner for trade adjustment benefits was not given actual notice of the 10-day period in which to request a hearing. The court held that the Secretary should provide *pro se* petitioners with actual notice of the opportunity to request a hearing. *Id.* Moreover, the court noted that " 'the cost and administrative burden of conveying the additional information is minimal when compared with the benefits reaped by the parties and the court....' " *Id.* (quoting *Tyler v. Donovan,* 3 CIT 62, 66, 535 F.Supp. 691, 694 (1982)).

■ In this case, the notice published in the *Federal Register* invited "petitioners or any persons showing a substantial interest in the subject matter of the investigation" to request a public hearing no later than November 24, 1980. 45 Fed.Reg. 75,366, (1980). In a letter to the OTAA that accompanied the initial petition for assistance, plaintiff did not request a public hearing, but asked "that whoever investigates this petition contact me personally so the facts can be laid on the table." In a letter dated November 4, 1980, the petitioner requested that "the investigator ... contact me and let me explain our position to him," and in a telephone conversation with the OTAA's investigator expressed the desire to meet with the investigator in Anaconda. Although plaintiff wanted to present his viewpoint in person, it is clear that no

specific request was made for a public hearing. It is also clear that the Secretary did not view plaintiff's letters as a request for a public hearing and, therefore, no public hearing was held. Since "the Secretary is obliged to conduct his investigation with the utmost regard for the petitioning workers," *Local 167, supra,* 643 F.2d at 31, it is the opinion of the Court that the OTAA's failure to notify the petitioner of his right to a public hearing was improper.

■ The Court concludes, however, that, in this case, the OTAA's failure to give actual notice does not require reversal because the Court finds that plaintiff has not been prejudiced by the lack of a public hearing. It is well established that "procedural irregularities in administrative proceedings must be prejudicial to a party in order to justify judicial intervention." *John V. Carr & Son, Inc. v. United States,* 69 Cust.Ct. 78, 87, C.D. 4377, 347 F.Supp. 1390, 1397 (1972), *aff'd,* 61 CCPA 52, C.A.D. 1118, 496 F.2d 1225 (1974). The administrative record is replete with materials submitted by the plaintiff and indications of telephone communications between OTAA and the plaintiff, as well as from other Railway workers. Also, the Secretary promptly published the required notices in the *Federal Register.* *E.g.,* 45 Fed.Reg. 75,366 (1980) (notice of institution of investigation); 46 Fed.Reg. 20,323 (1981) (notice of negative determination of eligibility). In this case, the plaintiff has not demonstrated any additional materials that he would have presented at a public hearing that would have been helpful to his case. Thus, the plaintiff has not demonstrated that the Secretary's failure personally to notify him prejudiced his right to a fair consideration of his petition by the OTAA.

■ Plaintiff also alleges that the OTAA's Anaconda investigation was improper because the OTAA conducted inquiries by mail and telephone. Plaintiff contends that, because there was no field investigation in Anaconda, Montana, he was denied an opportunity fully to explain his position. It is not clear, however, what materials, in addition to those submitted by

mail and through telephone conversations, the plaintiff would have produced at a field investigation. The nature and extent of the investigation in each case are "matters which properly rest within the sound discretion of the Secretary." *Woodrum v. Donovan*, 4 CIT 46, 51, 544 F.Supp. 202, 205 (1982).

In *Abbott v. Donovan*, 6 CIT ——, 570 F.Supp. 41 (1983), petitioning workers claimed that the OTAA abused its discretion by not conducting a field investigation. The court stated that, since the plaintiffs were unable to "show the appropriateness of and need for a field investigation," no finding of abuse of discretion could be made. *Id.* at ——, 570 F.Supp. at 47. In this case, plaintiff has failed to show how a field investigation in Anaconda would have aided OTAA's investigation. Moreover, the investigation undertaken presented a clear and accurate picture of the effect of imports on the workers' employment. Therefore, it is the determination of the Court that the OTAA did not abuse its discretion by conducting its Anaconda investigation by mail and telephone.

■ Plaintiff argues also that the Secretary of Labor wrongly concluded that increases of imports did not contribute importantly to the Railway workers' separation from employment. He contends that the findings and determinations of the Secretary are not supported by substantial evidence contained in the administrative record.

Plaintiff contends that imports of copper increased continuously from 1978 through September 1980, and that this absolute increase in imports was the cause of the Railway workers' separation from employment. As proof, plaintiff submits the 103.8 percent increase of imports during the first 9 months of 1980. In addition, plaintiff argues that imports negatively affected the domestic price of copper.

The Secretary found that imports increased industry-wide in 1980, but that the closing of the refinery and smelter, and the resulting separations of the Railway workers, were not the result of increased imports. The Anaconda facilities' production

figures increased in quantity and dollar value over the first 6 months of that year over the first 6 months of 1979, and tonnage hauled by the Railway actually increased during the first 6 months of 1980. Also, the evidence clearly supports the Secretary's conclusion that the decrease in tonnage hauled after July 1980 was caused by the miners' strike, not by increases of imports. The Railway hauled 813.1 short tons during the first 6 months of 1979, and 952.9 short tons during the same period in 1980, which amounts to a 17.2 percent increase in tonnage hauled. The Railway hauled 26.6 percent more anodes in 1980 than 1979.

The OTAA performed a survey of Anaconda's customers and found that the results did not show that increased imports were the cause of the separations. Anaconda's increased sales and production figures for the first half of 1980, as well as the increased amount of tonnage hauled by the Railway over the same period, provide a reasonable basis in the record for the Secretary's determination. In addition, there is substantial evidence that economic factors related to the cost of compliance with environmental regulations were the primary cause of the closing of the smelter and refinery. "While the court may identify flaws in the methodology used by the Secretary, it is not the court's function to substitute its own method of analysis for that of the Secretary." *Abbott v. Donovan*, 6 CIT ——, 570 F.Supp. 41, 47 (1983).

The plaintiff contends that the EPA report demonstrates that increased imports contributed importantly to the Railway workers' separation from employment. The report lists numerous factors which the EPA asserted contributed to Anaconda's decision to close the plants, including:

historically low profitability of the company's copper operations; high operating costs associated primarily with operating energy-intensive technology and processing low grade concentrates; cost of needed process improvements; high mining costs; underutilization of smelter capacity resulting from reduced supply of concentrates; and marketing problems with sulphuric acid.

*Environmental Protection Agency, Role of Clean Air Act Requirements in Anaconda Copper Company's Closure of its Montana Smelter and Refinery* 2–3 (1981). Anaconda decided that it could not economically make an investment to modify the plant, which would not solve its long-term needs.

 The Trade Act does not extend benefits to those whose place of employment is closed because of technological obsolescence. *See United Glass & Ceramic Workers v. Marshall,* 584 F.2d 398, 405 (D.C.Cir.1978). The legislative history of the Trade Act indicates that "total or partial separations that would have occurred regardless of the level of imports, e.g., those resulting from ... technological factors are not intended to be covered by the program." S.Rep. No. 1298, 93d Cong., 2d Sess. 133 (1974), *reprinted in* 1974 U.S. Code Cong. & Admin.News 7186, 7275. The legislature contemplated that the Secretary would deny certification when "another cause was so dominant that the separations ... would have been essentially the same irrespective of the [finding] of the import increase." *Id.* Thus, if a company closes a plant because technological and economic factors make continued operations impractical, it cannot be said that these factors are related to increases of imports. Subsequent increases of imports would be a result, not a cause, of the company's termination of production. In *Local 167, International Molders Union v. Marshall,* 643 F.2d 26 (1st Cir.1981), the United States Court of Appeals for the First Circuit stated: "If unforeseen events later produced a shift to imports, that would have no bearing on what caused the [plant] to close when it did." *Id.* at 31.

In *United Glass and Ceramic Workers v. Marshall,* 584 F.2d 398 (D.C.Cir.1978), the District of Columbia Circuit interpreted the words "contributed importantly" in light of changing technology. The court found that "Congress was concerned that the Trade Act's worker adjustment assistance provisions not become a general program of unemployment assistance," and added that "a court must afford the agency substantial deference in dealing with complex and diverse applications under an admittedly vague mandate." *Id.* at 407. The court concluded that, since "the OTAA's investigation yielded a picture of the relative importance of imports that [was] reasonably, though not 100% accurate," the Secretary should be affirmed.

Hence, after reviewing the pertinent legislation, judicial precedents, and the administrative record, the Court holds that the Secretary did not err in finding that imports of copper did not contribute importantly to the closing of the smelter and refinery and, thus, to the separation from employment of the Railway workers. Moreover, it is clear that economic factors unrelated to increases of imports were the reason for Anaconda's decision to close the plants. Accordingly, it is the holding of the Court that the Secretary of Labor's denial of certification is supported by substantial evidence, and is in accordance with the trade adjustment assistance provisions of the Trade Act of 1974. The determination of the Secretary is therefore affirmed, and plaintiff's action is dismissed.