**BUNKER LIMITED PARTNERSHIP, Plaintiff,**

v.

**William E. BROCK, Secretary of Labor, Defendant.**

**Court No. 87–02–00309.**

United States Court of International Trade.

May 17, 1988.

Witherspoon, Kelley, Davenport & Toole, Leslie R. Weatherhead and Randall K. Gaylord, Spokane, Wash., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Dept. of Justice, Jeanne E. Davidson, for defendant; Gary Bernstecker, Dept. of Labor, of counsel.

## OPINION

TSOUCALAS, Judge:

Plaintiff, Bunker Limited Partnership, on behalf of the former employees of Crescent Silver Mine, Incorporated of Big Creek and Kellogg, Idaho, brings this action to contest a final determination by the Secretary of Labor ("Secretary") denying Crescent's employees eligibility to apply for worker adjustment assistance under the Trade Act of 1974, §§ 221–249, 284, 19 U.S.C. §§ 2271–2321, 2395 (1982 & Supp. IV 1986) (hereinafter the "Trade Act"). The Secretary concluded that increased imports did not "contribute importantly" to the declines in production experienced at the Crescent Mine. Administrative Record at 36 (hereinafter "A.R. at ___"). Plaintiff requests remand for further proceedings on the grounds that the Secretary failed to undertake a full investigation, that the administrative record was incomplete, and that the Secretary's decision was not based on substantial evidence or in accordance with law.

### The Administrative Proceedings

Crescent Silver Mine, Incorporated ("Crescent") is a wholly-owned subsidiary of the Bunker Limited Partnership, plaintiff. A.R. at 32. Plaintiff established Crescent to own and operate the Crescent Silver Mine. *Id.* Plaintiff extracted ore from the mine, processed it into silver concentrate, then exported the entire yield. *See* A.R. at 36.

Plaintiff purchased and reopened the mine in 1983 under contract to export all the silver concentrate to a single customer in Belgium. *See* A.R. at 32, 36; *Plaintiff's Supplemental Brief in Reply to Defendant's Opposition to Motion for Remand* at 3. The mine was closed in May, 1986, at which time approximately sixty-three employees were laid off. A.R. at 16.

Plaintiff filed a petition with the Department of Labor requesting certification of eligibility to apply for trade adjustment assistance under section 221(a) of the Trade Act, 19 U.S.C. § 2271(a) (1982 & Supp. IV 1986). Plaintiff cited low silver prices caused by "increased foreign production which has flooded the [United States] market" as the reason for closing the Crescent Mine. A.R. at 2.

The Office of Trade Adjustment Assistance ("OTAA") conducted an investigation and determined that Crescent's workers did not meet the requirements for eligibility to apply for trade adjustment assistance under the Trade Act. A.R. at 32–34. The requirements for certification are as follows:

> The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—
>
> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,
>
> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
>
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

The Trade Act, section 222, 19 U.S.C. § 2272 (1982 & Supp. IV 1986).

The Secretary, applying the third criterion, concluded that "increases of imports" did not "contribute importantly" to the worker separation because Crescent had exported all of its output. *See* A.R. 34–36.

Plaintiff argues that no authority exists, either in the Trade Act itself or in the case law arising thereunder, to deny benefits merely because Crescent exported all of its silver concentrate. Plaintiff believes the Secretary should have first undertaken a full investigation in order to evaluate (1) the effect of foreign imports on United States silver prices, and (2) whether increased silver imports contributed importantly to the decline in sales and termination of the workers. *Plaintiff's Memorandum of Points and Authorities in Support of Motion to Remand for Further Proceedings* at 1 (hereinafter "Plaintiff's Memorandum at ___"). Without adequate information, plaintiff continues, "there is no way this Court can conclude that the Department[ ] [of Labor's] decision is 'the product of a reasoned analysis evident in the administrative record.'" *Id.* at 17 (citation omitted).

Thus, the issue is whether the Secretary may discontinue the investigation and deny certification of eligibility to apply for adjustment assistance once it is discovered that a company does not sell or compete in the domestic market, and exports all of its product. In other words, was the Trade Act intended to cover instances where a company loses export sales only.

### Discussion

Substantial weight must be given to an agency's interpretation of the statute it is empowered to administer. *Kelley v. Secretary, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed.Cir.1987) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986)); *see also Former Employees of Asarco's Amarillo Copper Refinery v. United States*, 11 CIT ——, ——, 675 F.Supp. 647, 649 (1987). The Court must uphold the Secretary's in-

terpretation of the Trade Act, provided it is "sufficiently reasonable" and does not "contravene clearly discernible legislative intent." *See Kelley*, 812 F.2d at 1380; *American Lamb*, 785 F.2d at 1001.

The legislative history of the Trade Act does not specifically indicate whether reduced export sales are a basis for granting trade adjustment assistance. However, examining the purpose of adjustment assistance since its inception reveals that the Secretary's construction of the Trade Act is neither unreasonable nor contrary to legislative intent.

Congress first established trade adjustment assistance in the Trade Expansion Act of 1962, Pub.L. No. 87–794, title III, § 321, 76 Stat. 872 (repealed 1975) (the "Expansion Act"). The Expansion Act was designed to "strengthen economic relations with foreign countries through the development of open and nondiscriminatory trading in the free world." S.Rep. No. 2059, 87th Cong., 2nd Sess. 40, *reprinted in* 1962 U.S.Code Cong. & Admin.News 3110, 3122. Congress realized that opening America's doors to foreign trade might have a "particularly severe effect on employment," and established adjustment assistance because "employment dislocation resulting from changes in trade policy necessitated a level of worker protection somewhat beyond what [was] available through regular State unemployment insurance programs." S.Rep. No. 1298, 93rd Cong., 2d Sess. 133, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7273. Therefore, Congress designed adjustment assistance "for the purpose of providing benefits to workers and companies adversely affected by competition from foreign imports." *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Donovan*, 746 F.2d 855, 857 (D.C.Cir.1984).

Congress substantially expanded and revised this program in the Trade Act because adjustment assistance had "proven to be an inadequate mechanism for providing relief to domestic industries injured by

import competition."[1] S.Rep. No. 1298, 93rd Cong., 2d Sess. 123, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 7263.

The Secretary's position in the case at bar is not inconsistent with the purpose of adjustment assistance outlined by Congress in both the Trade Expansion Act and the Trade Act. Congress described adjustment assistance in the context of providing relief to workers who had been injured as a result of import competition. Since Crescent never competed with imports in the domestic market, it is reasonable to conclude that the Trade Act was not intended to cover such instances.

Additionally, Congress specifically excluded from coverage under the adjustment assistance program factors which would cause worker separation regardless of the level of imports.[2] "The legislative history of section 222(3) ... clearly indicates that any separation resulting from a factor other than import penetration ... does not warrant certification." *Finkel v. Donovan*, 9 CIT 374, 383, 614 F.Supp. 1245, 1252 (1985).

It is not unreasonable to regard decreased export sales, when those are the only sales of a company, as such a factor; it lacks the necessary "direct and substantial" relationship to increased imports.

The Secretary has consistently interpreted section 222(3) to authorize trade adjustment assistance for workers only if they can establish an important causal nexus between increased imports and their separation from employment. Important causal nexus essentially refers to the term "contributed importantly," and suggests a direct and substantial rela-

tionship between increased imports and a decline in sales and production.
*Id.* at 382, 614 F.Supp. at 1251 (citations omitted).

The court in *International Brotherhood of Electrical Workers (Local 1160, Marion, Indiana) v. Donovan*, 10 CIT ——, ——, 642 F.Supp. 1183, 1187 (1986), for example, treated export sales as such a factor. In determining whether increased imports were an important cause of worker separation, the court found that "other factors accounted for the greatest portion of the overall decline in picture tube sales." *Id.* Of those factors, a substantial decrease in shipments to the export market was cited as a major cause of the worker separation. Lost sales domestically were "minor in relation to the decline in sales caused by reduced intra-company shipments and *the decrease in sales to the export market." Id.* (emphasis added). Thus, in affirming the Secretary's denial of plaintiff's petition for adjustment assistance, the court did not regard decreased export sales as a factor which would contribute to worker separation for purposes of granting eligibility to apply for adjustment assistance.

Plaintiff also contends that the price of silver worldwide is greatly affected by increased foreign production which has flooded the United States market. *Plaintiff's Memorandum* at 2–4, 15. The price Crescent receives for its silver in Belgium, plaintiff asserts, is "linked to the price of silver and imports of silver *into the United States." Id.* at 15 (emphasis in original). Therefore, plaintiff argues, the Secretary should have evaluated the effect of foreign imports on United States silver prices in

---

1. The worker adjustment assistance provisions enacted in 1962 had not been effective. No worker was found eligible for benefits in the first seven years of the program, and from that time until the enactment of the Trade Act in 1974, only 47,000 workers in 29 States had been certified as eligible to apply for assistance. The Trade Act eliminated the requirement present in the Expansion Act which required a causal link between increased imports and trade agreement concessions; it also lessened the causation standard by requiring that increased imports only "contribute importantly" to worker separations rather than be the "substantial cause." "Con-

tribute importantly" means a cause which is not less than any other cause, whereas "substantial cause" meant the cause was a major cause. *See* S.Rep. No. 1298, 93rd Cong., 2d Sess. 133, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 7273–75.

2. Congress lists examples of the types of effects to be excluded: "those resulting from domestic competition, seasonal, cyclical, or technological factors...." S.Rep. No. 1298, 93rd Cong., 2d Sess. 133, *reprinted in* 1974 U.S.Code Cong. & Admin.News at 7275.

order to determine whether increased imports into the United States depressed the world market price of silver to the extent that it "contributed importantly" to the worker separation at Crescent.

Lacking in plaintiff's claim, however, is the important causal nexus between increased imports and layoffs. The Trade Act "was not intended to provide trade adjustment assistance to all workers who lose their jobs due in some way to imports." *Asarco,* 11 CIT at ——, 675 F.Supp. at 659. The Court will not substitute its own judgment when the Secretary has made a reasonable interpretation which, unfortunately, results in plaintiff's ineligibility to apply for adjustment assistance. *See id.*

This Court's holding should not be construed by the Department of Labor as authority for disregarding, out of hand, all workers' claims involving exported goods. The Secretary must examine the facts and circumstances in each case to determine if the statutory requirements are otherwise met. *See Former Employees of Delco Systems Operations v. United States,* 11 CIT ——, ——, Slip Op. 87–122 at 10–11 (Nov. 5, 1987) [available on WESTLAW, 1987 WL 14674].

In *Delco,* the workers produced gun turrets which were exported to a Canadian company, mounted on light armored vehicles, then re-imported into the United States for sale to the United States Marine Corps. *Id.* The Secretary denied certification concluding that "lost export sales resulting from a shift of production to a foreign country [was] not a basis for certification under the terms of the Trade Act of 1974." *Id.* at 3. The *Delco* court, however, remanded the case to the Secretary upon finding that a shift from domestic to foreign production was not determinative in itself for denying certification. The gun turrets were produced domestically for ulti-

mate sale in the United States. Therefore, the Secretary's general assumptions as to whether lost export sales were capable of meeting the statutes' requirements were not a sufficient basis for denying eligibility. *Id.* at 10–11. The Secretary was directed to examine the particular facts to ascertain whether increased imports caused the domestic production to cease, and forced the company to shift production to foreign buyers.[3]

The important distinction between the instant case and *Delco* is that the present case involves no shift in production; Crescent never sold domestically.[4] The effect of increased imports on domestic production, therefore, could never be evaluated. The Crescent Mine was purchased for the purpose of exporting all its silver concentrate to a foreign buyer. There is no indication in the record to suggest that the product was to be re-imported into the United States. The OTAA's investigation, therefore, was sufficient to support the conclusion reached by the Secretary.

Plaintiff also asserts that the present record is incomplete because it failed to incorporate the administrative records of three prior determinations. Courts may look beyond the administrative record certified by the agency when it is clear that the record does not reflect relevant materials considered by the agency. *Exxon Corp. v. Department of Energy,* 91 F.R.D. 26, 33 (N.D.Tex.1981); *Tenneco Oil Co. v. Department of Energy,* 475 F.Supp. 299, 317 (D.Del.1979).

The Secretary had declared allegedly similarly situated workers eligible for trade adjustment assistance in those proceedings and plaintiff claims the Secretary incorporated them by reference into the record of this action. The three prior determinations are *Hecla Mining Company's Lucky Friday Mine,* 51 Fed.Reg. 36488 (1986); the *Sunshine Silver Mine,* 51 Fed.Reg. 36488

---

**3.** The court left open the applicability of section 283 of the Trade Act, 19 U.S.C. § 2394, in such a situation. Section 283 provides that firms which shift productive facilities to a foreign country should, *inter alia,* apply and use adjustment assistance to the extent possible for the

benefit of their workers. *See id.;* Slip Op. 87–122 at 11.

**4.** Although the mine was previously operated for domestic consumption by a different, but related owner, it closed when its sole domestic smelter closed in 1981. *See* A.R. at 25.

(1986); and the *Star Mine*, 48 Fed.Reg. 28361 (1983) (revised determination on reconsideration).

However, the Lucky Friday Mine and the Sunshine Silver Mine maintained domestic sales. The Star Mine also sold domestically until it lost its only purchaser, a smelter located in the United States.[5] After the smelter closed, the Star Mine exported until it shut down nine months later. The Secretary determined that "because the Star Mine had not been exporting its product long enough to develop a foreign market, the Department [of Labor] did not consider the fact that the Star Mine had exported its product during the nine months immediately prior to its closure to be legally significant." *Defendant's Surreply to Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Remand* at 2.

Hence, the Department of Labor considered the closure of the domestic smelter to be more significant with respect to the Star Mine than the Crescent Mine because the Star Mine ceased production altogether shortly after the closing. The Crescent Mine, on the other hand, reopened under new ownership nearly two years later for the purpose of exporting all of its product to a Belgian smelter. This was the critical distinguishing feature upon which the Secretary based his decision.

There is no requirement for a field investigation if there is no showing of need. *Miller v. Donovan*, 9 CIT 473, 479, 620 F.Supp. 712, 718 (1985). No amount of investigation would alter the fact that the other mines had domestic sales whereas Crescent did not. Moreover, the nature and extent of the investigation in each case are "matters which properly rest within the sound discretion of the Secretary." *Id.* (citing *Woodrum v. Donovan*, 4 CIT 46, 51, 544 F.Supp. 202, 205 (1982)); *see also Finkel*, 9 CIT at 381, 614 F.Supp. at 1250. Plaintiff has not shown how the instant record is rendered incomplete by not containing the entire administrative records of the prior determinations.

The OTAA discontinued the investigation once it discovered that Crescent exported all its silver concentrate. The OTAA acted correctly if the Secretary's interpretation of the Trade Act was in accordance with law and supported by substantial evidence. 19 U.S.C. § 2395(c) (1982); *see also Miller*, 9 CIT at 479, 620 F.Supp. at 718.

It is the determination of the Court that the Secretary's interpretation of the scope of the certification requirements under the Trade Act was reasonable and in accordance with law. Therefore, the plaintiff's motion to remand for further proceedings is denied.

---

5. This smelter was the same smelter which forced the Crescent Mine to close originally; both mines were owned by the Bunker Hill Company.