**Slip Op. 03-9**

# United States Court of International Trade

|  |  |
|---|---|
| FORMER EMPLOYEES OF SPINNAKER COATING MAINE, INC. | |
| Plaintiffs, | Before: Pogue, Judge |
| v. | Court No. 02-00203 |
| ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, | |
| Defendant. | |

[Plaintiffs' motion for judgment on the agency record denied. Plaintiffs' motion for remand for further investigation granted.]

Decided: January 28, 2003

Provost Umphrey, L.L.P. (Daniel A. Bailey) for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Brent M. McBurney, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Jayant A. Reddy, Attorney, Office of the Solicitor, U.S. Department of Labor, Of Counsel, for Defendant.

## Opinion

**Pogue, Judge:** This matter is before the Court on the motion of Former Employees of Spinnaker Coating Maine, Inc. ("Plaintiffs") for judgment on the agency record pursuant to USCIT Rule 56.1, or in the alternative, for remand of the action for further investigation. Plaintiffs challenge the negative eligibility

determination for trade adjustment assistance benefits of the United States Department of Labor, Office of Trade Adjustment Assistance ("Labor" or "Department").  Plaintiffs claim Labor failed to: (1) support its decision that increased imports did not contribute importantly to the separation of Plaintiffs from their employment by substantial evidence; (2) conduct its investigation within the relevant time period; and (3) adequately investigate the contribution of imports to the separation of Plaintiffs from their employment.  The Court exercises jurisdiction pursuant to 19 U.S.C. § 2395(c) (2000) and 28 U.S.C. § 1581(d)(1) (2000).  For the reasons that follow, the Court remands this action to Labor for further investigation.

## I. Background

The purpose of the trade adjustment assistance program is "to offer unemployment compensation, training, job search and relocation allowances, and other employment services to workers who lose their jobs because of import competition."  Former Employees of Kleinerts, Inc. v. Herman, 23 CIT 647, 647, 74 F. Supp. 2d 1280, 1282 (1999) (quoting Former Employees of Parallel Petroleum Corp. v. United States Sec'y of Labor, 14 CIT 114, 118, 731 F. Supp. 524, 527 (1990)).

Labor is required to certify petitioning plaintiffs as eligible for assistance benefits if it determines, in accordance

with section 222 of the Trade Act of 1974 ("Trade Act"),[1] as amended, 19 U.S.C. § 2272(a):

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,
> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a). Plaintiffs seeking trade adjustment assistance benefits must satisfy all three of the requirements contained in § 2272(a). See, e.g., Former Employees of Kleinerts, Inc., 23 CIT at 648, 74 F. Supp. 2d at 1282; Former Employees of Bass Enter. Prod. Co. v. United States, 13 CIT 68, 70, 706 F. Supp. 897, 900 (1989); Abbott v. Donovan, 8 CIT 237, 239, 596 F. Supp. 472, 474 (1984). Thus, trade adjustment assistance can only be certified "if it can be established that an important causal nexus exists between increased imports of like or directly competitive articles, declines in sales or production and the workers'

---

[1]Although Congress recently amended the Trade Act, Trade Adjustment Assistance Reform Act of 2002, Pub. L. No. 107-210, § 113, 116 Stat. 933, 937 (Aug. 6, 2002), those revisions do not apply to the instant matter, as Plaintiffs' petition predates the application of the amended statute. See Pub. L. No. 107-210, § 151, 116 Stat. at 953. Accordingly, all references to the Trade Act denote the pre-amendment version of the statute. See 19 U.S.C. § 2272 (2000).

separation from employment." Former Employees of Hewlett-Packard Co. v. United States, 17 CIT 980, 985 (1993) (internal citation omitted).

Spinnaker Coating Maine, Inc. ("Spinnaker"), a subsidiary of Spinnaker Industries, produced pressure sensitive papers, including among others, EDP, Thermal transfer, and Semi-gloss type products in Westbrook, Maine.[2]  Admin. Rec. at 2, 6.  On May 22, 2001, Plaintiffs filed their petition with Labor for trade adjustment assistance pursuant to Section 221(a) of the Trade Act of 1974 on behalf of 91 workers.  Id. at 1-2.  Plaintiffs represent both union and non-union former employees of Spinnaker; specifically, the non-union employees are joined by the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("PACE"), Local 169.  Admin. Rec. at 2, 23.  The petition asserted that a "price war" with a foreign competitor caused the company to close and dismiss 91 employees.  Id. at 2.  On July 15, 2001, Spinnaker permanently closed.  See Admin. Rec. at 6.

Labor published notice of Plaintiffs' filing and the Department's initiation of an investigation to determine

---

[2]As both parties concede that Spinnaker produced these specific types of pressure sensitive papers, the Court will consider discussion of purchases of a specific type as purchases of the relevant product, pressure sensitive papers.  Pls.' Mot. J. Agency R. or Remand Further Investig. at 2 ("Pls.' Br."); Spinnaker Coating Maine Incorporated Westbrook, ME, 67 Fed. Reg. 4,756, 4,756 (Dep't Labor Jan. 31, 2002) (notice of negative determination regarding application for reconsideration) ("Neg. Determ.").

eligibility for assistance on July 5, 2001. <u>Investigations Regarding Certifications of Eligibility to Apply for Worker Adjustment Assistance</u>, 66 Fed. Reg. 35,465, 35,465 (Dep't Labor July 5, 2001). To investigate Plaintiffs' petition, Labor sent a request to Allen Hooper ("Hooper"), Director of Operations at Spinnaker, seeking information relating to sales, production, and employment at Spinnaker's Maine facility, as well as Spinnaker's "major declining customers." Admin. Rec. at 7-9.

In response to the information provided by Hooper, Labor sent surveys to six of Spinnaker's "major declining customers." <u>See</u> Admin. Rec. at 9, 12-13, 16-17, 19. Five customers responded. <u>Id.</u> at 12-13, 16-17, 19. Question One requested that the customers specify their total purchases of pressure sensitive papers from Spinnaker and other domestic and foreign sources for the years 1999 and 2000, and for the period January through March 2000 and 2001 (collectively the "surveyed periods"). <u>Id.</u> Three customers, Customer A, Customer B, and Customer C, responded that they did not purchase pressure sensitive papers from foreign sources during the surveyed periods. Admin. Rec. at 16, 17, 19. The survey responses provided by Customer B and Customer C also indicate that the amount of most domestic purchases increased in 2000 compared to 1999, while the dollar "value" or cost of the product decreased. <u>Id.</u> at 17, 19. A fourth customer, Customer D, indicated that it had purchased pressure sensitive papers from foreign sources. <u>Id.</u> at

That customer indicated a decrease in dollar value or cost of the imported product purchased from its 2000 total compared to 1999, as well as for the period January through June 2001 compared to the same period in 2000.  Id.  The last customer, Customer E, also indicated that it had not purchased any pressure sensitive papers from foreign sources during the surveyed periods, facsimile dated July 18, 2001.  Id. at 13.  Customer E's survey indicated however that it purchased EDP type papers from Spinnaker at decreasing dollar values or costs in 2000 compared to 1999 and for the period January through March 2001 compared to the same period in 2000.  Id.  It further stated that Customer E purchased Thermal transfer type papers from other domestic sources at increasing dollar values or costs in 2000 compared to 1999 and for the period January through March 2001 compared to the same period in 2000. Id.

Question Two asked the customers to identify the percentage of pressure sensitive papers purchased from other domestic firms but wholly manufactured in a foreign country.  See id. at 12, 13, 16, 17, 19.  All five surveys noted that none of their purchases from other domestic sources were manufactured in a foreign country.  Id. Customer E's survey also noted under Question Two, without further explanation, a substantial percentage.  Id. at 13.

A handwritten note dated December 17, 2001 accompanied Customer E's survey.  The note states that Customer E began

importing Thermal transfer type papers from the foreign competitor in February 1999 continuing until late in 2001.  Admin. Rec. at 14. It further specifies that Customer E continued to purchase EDP type papers from Spinnaker during the surveyed periods.  Id.  The note states that a substantial percentage of Thermal transfer type paper purchases from the other domestic sources was imported.  See id. Customer E also commented that Thermal transfer type papers were not purchased from Spinnaker during the relevant period.  Id.

Labor concluded in its investigation findings that Spinnaker's sales, production and employment decreased in 2000 compared to 1999, and for the period January through March 2001 compared to the same period in 2000.  Trade Adjustment Assistance Investigative Report ("Investigative Report"), Admin. Rec. at 20-21.  The investigation also revealed that layoffs began in January 2000 and continued through July 2001, when the plant closed permanently. Id.  In denying Plaintiffs' petition on September 11, 2001, the Department found that the investigation failed to prove the "contributed importantly" requirement.  Notice of Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance, 66 Fed. Reg. 47,242, 47,242 (Dep't Labor Sept. 11, 2001).  Specifically, Labor stated that the investigation did not reveal that during the surveyed periods the customers increased their purchases of imports while decreasing their purchases from Spinnaker.  See Spinnaker Coating

Maine Incorporated, Westbrook, Maine, (Dep't Labor Aug. 23, 2001),

Admin. Rec. at 23-24 (notice of negative determination regarding

eligibility to apply for worker adjustment assistance) (unpublished

determination) ("Initial Determ."). Labor also concluded that U.S.

imports of pressure sensitive papers decreased during the period of

January through May 2001 when compared to the same period in 2000.

Id.

On September 28, 2001, PACE, Local 169 sought reconsideration

of Labor's negative determination and presented new evidence

supporting its contentions. Admin. Rec. at 30-62. Plaintiffs

argued that the statutory criteria had been satisfied, because

imports contributed importantly to the absolute decline in

Spinnaker's sales dollars. See Admin. Rec. at 30. In particular,

Plaintiffs claimed that the Department's decision was erroneous

because Labor improperly identified the relevant time period, and

because Labor failed to adequately survey Spinnaker's "major

declining customers."[3] Id. Because Labor failed to evaluate the

entire years of 1999 and 2000, Plaintiffs claimed Labor did not

examine the proper relevant time period. See Admin. Rec. at 31.

---

[3]A third argument was presented for reconsideration.
Plaintiffs contested Labor's classification of the like product.
Admin. Rec. at 30. Rather than producing Pressure Sensitive
Labels (HTS-4821902000), Plaintiffs argued Spinnaker produced
Pressure Sensitive Papers (HTS-4811210000). Id.; see also Neg.
Determ., 67 Fed. Reg. at 4,756. Labor agreed, but found that the
improper classification had no effect on its initial negative
eligibility determination. Id.

To support their contention, Plaintiffs attached evidence stating that prior to Customer E's switch to importing Thermal transfer type papers from the foreign competitor in February 1999, Customer E annually purchased $2,250,000.00 worth of Thermal transfer type papers and $1,620,000.00 worth of EDP type papers from Spinnaker. See Admin. Rec. at 60, 62; see also Pls.' Br. at 3-4. Plaintiffs also included two pages of a seven-page report prepared by Fred Forstall, International Trade Analyst at the United States International Trade Commission ("ITC Report"), which report describes an annual quantitative increase in imports of the like product for U.S. consumption from 1996 through 2000. Admin. Rec. at 54-55. The data revealed however a decline in imports of the like product for the period January through June 2001 compared to the same period in 2000. Id. at 55. Plaintiffs further argued that foreign competition caused Spinnaker to lower prices to maintain sales volume. Id. at 32. Such evidence, Plaintiffs contended, demonstrated that Spinnaker's sales of pressure sensitive papers decreased while imports increased. See Admin. Rec. at 31.

Upon finding that the data collected from customer surveys in the initial investigation demonstrated an "overwhelming reliance on domestic customer purchases of pressure sensitive papers . . . during the relevant period," Labor denied Plaintiffs' reconsideration request on January 31, 2002. Neg. Determ., 67 Fed.

Reg. at 4,756. Labor stated that the survey approach was primarily relied on to determine if imports "'contributed importantly' to the declines [sic] in sales and/or production and employment at the subject firm." Id. Labor also found that the "pertinent time periods of 1999, 2000 and the January through June 2001 over the corresponding 2000 period" were examined while investigating the petition. Id. As such, Labor concluded that Customer E's decision to import Thermal transfer type papers from the foreign competitor in February 1999 was beyond the relevant time period of its investigation. Id.

In affirming its prior decision, Labor again concluded that the "contributed importantly" requirement had not been met, as none of the customers increased their purchases of imported pressure sensitive papers while decreasing such purchases from Spinnaker during the relevant period. See id. at 4,756-57. Labor attributed Spinnaker's financial loss to domestic, rather than foreign, competition, since "only small amounts of imports (and declining) were purchased during the relevant period." Id. The Department further held that price was not a factor considered in evaluating the "contributed importantly" requirement of Section 222(3) of the Trade Act of 1974, as amended. Id. at 4,757. Based on the survey results, Labor found that price suppression caused by competition with the foreign competitor was not a major factor contributing to the decline in Spinnaker's sales, production and employment. See

id.


## II. Standard of Review

In reviewing the Secretary's decision to deny Plaintiffs' petition for certification of eligibility for trade adjustment assistance benefits, the Court must determine whether that decision is supported by substantial evidence and in accordance with law. United Steelworkers of Am. v. United States Sec'y of Labor, 17 CIT 1188, 1190 (1993) (internal citation omitted); Woodrum v. Donovan, 5 CIT 191, 193, 564 F. Supp. 826, 828 (1983), aff'd, 737 F.2d 1575, 1576 (Fed. Cir. 1984); see also 19 U.S.C. § 2395(b) ("The findings of fact by [Labor] . . . if supported by substantial evidence, shall be conclusive.").

"Because of the ex parte nature of the certification process, and the remedial purpose of the [benefits] program, [Labor] is obligated to conduct [its] investigation with the utmost regard for the interest of the petitioning workers." Local 167, Int'l Molders v. Marshall, 643 F.2d 26, 31 (1st Cir. 1981).

The Court "for good cause shown, may remand the case to [Labor] to take further evidence." 19 U.S.C. § 2395(b). "Good cause exists if the [Department's] chosen methodology is so marred that [its] finding is arbitrary or of such a nature that it could not be based on substantial evidence." Former Employees of Linden Apparel Corp. v. United States, 13 CIT 467, 469, 715 F. Supp. 378,

381 (1989) (internal citations omitted).

### III. Discussion

There are three issues presented. The Court must determine whether: (1) Labor's finding that imports did not contribute importantly to the separation of Spinnaker's employees is supported by substantial evidence; (2) Labor conducted its investigation during the appropriate "representative base period" or relevant period; and (3) Labor adequately investigated the contribution of imports to the separation of Plaintiffs from their employment.

### A. Contributed Importantly

Plaintiffs contest Labor's findings that only one customer, Customer D, imported "small amounts" of the like product at declining levels during the relevant period and that "[n]one of the other [surveyed customers] imported pressure sensitive papers during the relevant period." Pls.' Br. at 5, 7 (quoting Investigative Report, Admin. Rec. at 21-22); see also Neg. Determ., 67 Fed. Reg. at 4,756-57. Plaintiffs argue that those conclusions are contrary to the evidence in the record for two reasons. First, the survey responses provided by Customer B and Customer C indicate an increase in the amount of product purchased in 2000 compared to 1999, even though the annual dollar value or cost of the product decreased. Pls'. Br. at 8. Second, Customer E admitted that it

began importing the like product from the foreign competitor in February 1999 and that a substantial percentage of the product purchased from the other domestic sources was imported. Id. at 3-5. In other words, Plaintiffs challenge Labor's conclusion that import penetration did not contribute importantly to the separation of Plaintiffs from their employment as unsupported by substantial evidence on the record. See Pls.' Br. at 5.

"Contributed importantly" is statutorily defined as "a cause which is important but not necessarily more important than any other cause." 19 U.S.C. § 2272(b)(1). According to Labor's regulations, "increased imports" means "imports have increased either absolutely or relative to domestic production compared to a representative base period." DOL Certification of Eligibility to Apply for Worker Adjustment Assistance, 29 C.F.R. § 90.2 (2001).

"'In determining whether increased imports contributed importantly to the separation of the workers, [Labor] often employs a "dual test" which looks to whether the subject company's customers reduced purchases from that company and at the same time increased purchases of competitive imports.'" Int'l Union v. Reich, 22 CIT 712, 719, 20 F. Supp. 2d 1288, 1295 (1998) (quoting United Steelworkers of Am., 17 CIT at 1190). Even though the dual test "'is not . . . very sophisticated,'" the Court has found it "'a reasonable means of ascertaining a causal link between imports and separations.'" Id.; see also Local 167, 643 F.2d at 30-31;

United Glass and Ceramic Workers v. Marshall, 584 F.2d 398, 405-06 (D.C. Cir. 1978). The causal link required is "'a direct and substantial relationship between increased imports and a decline in sales and production.'" Id.; see also Estate of Finkel v. Donovan, 9 CIT 374, 382, 614 F. Supp. 1245, 1251 (1985).

Here, Labor surveyed six "major declining customers" identified by Plaintiffs as purchasers of Spinnaker's pressure sensitive papers. Admin. Rec. at 9; Initial Determ., Admin. Rec. at 24. Upon receiving five responses, Labor evaluated the surveys to determine whether any of those customers increased import purchases of the like product while decreasing purchases from Spinnaker. See Investigative Report, Admin. Rec. at 21-22.

Customer A, Customer B, and Customer C did not import the like product during the surveyed periods. Admin. Rec. at 16-17, 19. The survey responses provided by Customer B and Customer C, however, indicate that the amount of most domestic purchases increased in 2000 compared to 1999, while the dollar value or cost of the product decreased. Id. at 17, 19. Customer D imported the like product, but at decreasing dollar values or costs during the surveyed periods. Admin. Rec. at 12. Customer D's survey does not contain any data detailing the amount of the like product purchased from foreign sources. Id. Customer E's survey states that it also did not import the like product during the surveyed periods. Id. at 13. Its survey indicates that Thermal transfer type papers were

purchased from other domestic sources at increasing dollar values or costs in 2000 compared to 1999 and for the period January through March 2001 compared to the same period in 2000. Id. The survey further reveals that Customer E purchased EDP type papers from Spinnaker at decreasing dollar values or costs in 2000 compared to 1999 and for the period January through March 2001 compared to the same period in 2000. Id. The handwritten note accompanying the survey, dated December 17, 2001, however, states that Customer E imported Thermal transfer type papers from the foreign competitor beginning in February 1999 until late in 2001. Id. at 14, 60. The note further states that a substantial percentage of the purchases from the other domestic sources was imported. Id. at 14.

On the basis of this evidence, Labor concluded that Customer D only imported "small amounts" of the like product at declining levels during the relevant period. See Neg. Determ., 67 Fed. Reg. at 4,757. The record, however, is devoid of any evidence illustrating that the amount of Customer D's import purchases decreased during the surveyed periods. Instead, the record contains evidence demonstrating that the dollar value or cost of Customer D's import purchases decreased during the surveyed periods. Nothing in the record connects this fact to Labor's conclusion that Customer D imported "small amounts" of the like product. Accordingly, Labor's conclusion is unsupported by

substantial evidence.

Customer E's responses indicate that it decreased purchases of EDP type papers from Spinnaker while increasing purchases of imported Thermal transfer type papers from the foreign competitor. Admin. Rec. at 13-14, 62. Its handwritten note further states that a substantial percentage of the product purchased from the other domestic sources was imported. Id. at 14. Despite this evidence, Labor found that "none of the [surveyed customers] increased their purchases of imported pressure sensitive papers, (including EDP, thermal transfer, semi[-]gloss etc.) importantly, while decreasing their purchases from [Spinnaker] during the relevant period." Neg. Determ., 67 Fed. Reg. at 4,756. Labor's conclusion that none of the surveyed customers increased purchases of imported pressure sensitive papers while decreasing purchases from Spinnaker is directly contradicted by the note to Customer E's response. Accordingly, the Court finds Labor's contributed importantly determination is not supported by substantial evidence, and remands the instant action to Labor for further investigation.

## B. The Relevant Time Period

As discussed above, Labor's surveys produced data from five of Spinnaker's "major declining customers," detailing each customer's total purchases from Spinnaker and other domestic and foreign sources in 1999, 2000, and the period January through March of 2000

and 2001.  Admin. Rec. at 12-13, 16-17, 19.  Plaintiffs contend that Labor erred in dismissing as outside the relevant period for the petition and investigation data showing that in February 1999 Customer E switched its purchases of Thermal transfer type papers from Spinnaker to the foreign competitor.  Pls.' Br. at 3-4.  Labor argues that the determination of the relevant period is a matter left to the discretion of the agency.  Def.'s Mem. Opp'n to Mot. J. Agency R. at 19 ("Labor's Mem.").

To determine whether increased imports have contributed importantly to the separation of Plaintiffs, Labor is directed to use a "representative base period" for comparison, which is defined in the agency's regulations as "one year consisting of the four quarters immediately preceding the date which is twelve months prior to the date of the petition."  29 C.F.R. § 90.2.  Because Plaintiffs' petition was filed on May 22, 2001, the representative base period under the regulations appears to be the four quarters prior to May 22, 2000.  In other words, the representative base period would be the last three quarters of 1999 and the first quarter of 2000.

Labor's surveys, however, appear to consider data throughout the entire years of 1999 and 2000, as well as for the period of January through March of 2000 and 2001.  In particular, the customer surveys ask for total purchases or percentages of the like product purchased in 1999 and 2000.  Admin. Rec. at 12-13, 16-17,

19. Labor's Investigative Report also refers to the period of investigation as 1999 and 2000. Investigative Report, Admin. Rec. at 21 ("The Department conducted a survey of six major declining customers . . . of [Spinnaker] regarding their purchases of pressure sensitive papers in 1999, [and] 2000. . . ."); see also Initial Determ., Admin. Rec. at 24. Finally, in its reconsideration determination, Labor stated without further specification that the "pertinent time periods" of 1999 and 2000 were examined during the investigation. Neg. Determ., 67 Fed. Reg. at 4,756. Because Labor collected data reaching back to the first quarter of 1999, the Department's conclusion that Customer E's purchases of imported Thermal transfer type papers beginning in February 1999 are outside the relevant period of Plaintiffs' petition and investigation is inconsistent with the investigation undertaken by the Department. Although Labor "has considerable discretion in conducting its investigations, it is required to comply with its own regulations," United Steelworkers of Am., 17 CIT at 1194, and provide an explanation of the investigative measures undertaken. See Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT __, __, 215 F. Supp. 2d 1345, 1352 (2002) (holding that Labor's investigation fell below the threshold requirement of reasonable inquiry because it failed to explain how the plaintiffs' work did not satisfy the "producing" an article requirement under 19 U.S.C. § 2272); Former Employees of Hawkins

Oil & Gas, Inc. v. United States Sec'y of Labor, 17 CIT 126, 129, 814 F. Supp. 1111, 1114 (1993) (finding that Labor had a duty to provide an explanation of the criteria used to support its conclusion). Here, Labor's investigation is inconsistent with the agency's regulatory definition of a representative base period, and the Department has not provided an explanation for the inconsistency.

Labor argues that a determination of the relevant period is a matter left to the discretion of the agency. Labor's Mem. at 19. Labor supports its contention by relying on Smith v. Brock, 12 CIT 1009, 1014, 698 F. Supp. 938, 942 (1988). Labor's reliance on Smith is misplaced, however, because the investigation undertaken in that case occurred prior to the amendment of the regulatory definition of the terms "increased imports" and "representative base period." More specifically, Labor investigated the Smith petition in 1984 under the prior and more deferential definition of "increased imports,"[4] while the instant matter was investigated according to the amended regulations which became effective on June 19, 1987. Final Rule: Certification of Eligibility to Apply for

---

[4]"Increased imports" was previously defined as meaning "imports have increased either absolutely or relatively, and would generally mean those increases have occurred from a representative base period subsequent to the effectiveness of the most recent trade agreement concessions proclaimed by the President beginning in 1968." Final Rule: Certification of Eligibility to Apply for Worker Adjustment Assistance, 42 Fed. Reg. 32,771, 32,773 (Dep't Labor June 28, 1977).

Worker Adjustment Assistance, 52 Fed. Reg. 23,400, 23,400 (Dep't Labor June 19, 1987). In the amended regulations, Labor explicitly defined the term "representative base period" as stated above. See id. at 23,401. Thus, in the instant case, Labor is required to comply with its regulatory limitations defining the representative period, and provide an explanation for the investigative measures undertaken. United Steelworkers of Am., 17 CIT at 1194 (holding that Labor is required to comply with its regulations); Former Employees of Marathon Ashland Pipeline, LLC, 26 CIT at ____, 215 F. Supp. 2d at 1352 (finding that Labor is required to provide an explanation of the investigation undertaken).

Here, Labor's conclusion to exclude Customer E's import purchases beginning in February 1999 from the representative base period is inconsistent with the investigation undertaken, because Labor's surveys seek data encompassing the entire years of 1999 and 2000. Labor has also failed to explain the inconsistency. Accordingly, the Court must remand.

### C. Labor's Methodology

Plaintiffs advance four arguments to support their contention that Labor "ignored and/or failed to completely analyze and follow-up" on data received during the investigation. See Pls.' Br. at 3. First, Plaintiffs argue that Labor should have applied "a more sophisticated analysis" than the dual test under the facts of this

case, because that test overlooks the effects of foreign price suppression in the U.S. marketplace.  <u>See</u> Pls.' Br. at 11-12. Second, Plaintiffs claim that Labor should have considered the effects of price suppression caused by foreign imports on Spinnaker and its product line in rendering its eligibility determination. <u>See</u> Pls.' Br. at 10, 12.  Plaintiffs' third argument is that the investigation failed to include a trade and industry analysis, "despite such studies routinely being relied upon in prior cases." <u>Id.</u> at 9.   Finally, Plaintiffs claim that Labor failed to investigate the "source of the product received from other domestic firms and the possible indirect influence of imports" on Spinnaker and the U.S. marketplace.  <u>Id.</u> at 7.

It is well established that "'the nature and extent of the investigation are matters resting properly within the sound discretion of the administrative officials.'" <u>Former Employees of CSX Oil and Gas Corp. v. United States</u>, 13 CIT 645, 651, 720 F. Supp. 1002, 1008 (1989) (quoting <u>Cherlin v. Donovan</u>, 7 CIT 158, 162, 585 F. Supp. 644, 647 (1984)); <u>see also</u> <u>Estate of Finkel</u>, 9 CIT at 381, 614 F. Supp. at 1250.  As stated above at page 13, the Court has approved Labor's use of the dual test as a "reasonable means of ascertaining the existence of a causal nexus between increased imports and a firm's lost sales, and thus the resultant layoff of its employees," even though the Court recognizes the test is "not . . . very sophisticated." <u>Cherlin v. Donovan</u>, 7 CIT at

162, 585 F. Supp. at 647 (citing Local 167, 643 F.2d at 30). In applying the dual test in the instant case, Labor's investigation attempts to reveal whether the requisite causal link exists. As such, Labor's chosen methodology was reasonable.

Plaintiffs' second argument is that Labor should have considered the effects of price suppression caused by foreign imports on Spinnaker and its product line. Pls.' Br. at 10. Plaintiffs contend that two customer surveys indicating an increase in the quantity of the like product purchased, but also a decrease in the dollar value or cost, Admin. Rec. at 17, 19, a statement by Hooper indicating in his opinion that "extreme price pressure" caused by the foreign competitor created price and volume erosion, Admin. Rec. at 57, and a statement by a former salesman indicating the difference between Spinnaker's and the foreign competitor's prices during the surveyed periods, Admin. Rec. at 62, support their contention. Pls.' Br. at 12-13.

"The legislative history of Section 222(3) of the Trade Act 'clearly indicates that any separation resulting from a factor other than import penetration . . . does not warrant certification.'" W. Conference of Teamsters v. Brock, 13 CIT 169, 182, 709 F. Supp. 1159, 1170 (1989) (quoting Estate of Finkel, 9 CIT at 383, 614 F. Supp. at 1252). "It is also clear that the Trade Act was not intended to provide trade adjustment assistance to all workers who lose their jobs due in some way to imports." W.

Conference of Teamsters, 13 CIT at 182, 709 F. Supp. at 1170 (internal citation omitted).  Moreover, "this Court must give substantial weight to the [Department's] interpretation of a statute [the agency] is charged with administering as long as it is sufficiently reasonable."  W. Conference of Teamsters, 13 CIT at 181, 709 F. Supp. at 1169 (citing Bunker Ltd. Partnership v. Brock, 12 CIT 420, 422, 687 F. Supp. 644, 646 (1988)).  Nonetheless, "[t]he legislative histories of section 222 and its predecessor the Trade Expansion Act, also show that Congress intended the [Department] to engage in a broad examination of economic factors in determining whether there was a 'causal nexus' between imports and layoffs or plant closings under section 222(3)."  W. Conference of Teamsters, 13 CIT at 182, 709 F. Supp. at 1170 (internal citations omitted).

Here, Labor concluded without authority or explanation that "[p]rice is not a factor that is considered in meeting the 'contributed importantly' group eligibility requirement of section 222(3) of the Trade Act of 1974."  Neg. Determ., 67 Fed. Reg. at 4,757.  The price of foreign imports which are directly comparative with the articles Plaintiffs produced is not a factor which can rationally be ignored.  See Former Employees of Hawkins Oil & Gas, Inc., 17 CIT at 128-29, 814 F. Supp. at 1114 (finding Labor's investigation inadequate because the agency disregarded a customer list showing a decline in the relevant product's prices during the

relevant period as "not significant" without further explanation and failed to evaluate the connection between imports and the decline in the prices of the relevant product). Rather, Labor's decision to ignore price is directly contradicted by the legislative history's mandate of a broad causal analysis. W. Conference of Teamsters, 13 CIT at 182, 709 F. Supp. at 1170. Moreover, the Court also is troubled by the fact that Labor had the domestic price data for pressure sensitive papers during the relevant period available to it, as the Department publishes this information, and failed to evaluate it. Former Employees of Hawkins Oil & Gas, Inc., 17 CIT at 129, 814 F. Supp. at 1114 ("The fact that [Labor] had the information available to it and didn't even bother to look at it is inexcusable."). Accordingly, the Court cannot find Labor's conclusion to disregard price in its contributed importantly analysis reasonable. The Court therefore remands for further investigation and explanation.

Third, Plaintiffs argue that Labor's investigation lacked thoroughness because the Department did not conduct a trade and industry investigation. See Pls.' Br. at 3, 9-10. As discussed above, Labor has discretion with regard to the conduct of such an investigation. See Former Employees of CSX Oil and Gas Corp., 13 CIT at 651, 720 F. Supp. at 1008 (quoting Cherlin v. Donovan, 7 CIT at 162, 585 F. Supp. at 647) ("'The nature and extent of the investigation are matters resting properly within the sound

discretion of the administrative officials.'"); see also Estate of Finkel, 9 CIT at 381, 614 F. Supp. at 1250 (same). Even though Plaintiffs presented the ITC Report demonstrating a general increase in imports of the like product in the U.S. marketplace in 2000 as compared to 1999 and Customer E's note indicating that a substantial percentage of the like product received from the other domestic firms was imported, Pls.' Br. at 10, this evidence alone does not demonstrate that a trade and industry investigation would be crucial to determine whether increased imports contributed importantly to the separation of Plaintiffs from their employment. While the legislative history's mandate of a broad causal analysis would support a trade and industry investigation, the Court cannot conclude that Labor's decision to omit such an investigation in this case is clearly unreasonable.

Plaintiffs' fourth argument is that Labor should have considered the source of the like product purchased by Spinnaker's customers from other domestic plants in its contributed importantly conclusion. See Pls.' Br. at 7. Plaintiffs direct the Court to consider Customer E's handwritten note admitting that a substantial percentage of its purchases from the other domestic sources was imported, and the ITC Report indicating a general increase of the like product in 2000 as compared to 1999. Id. at 6. The record however also contains four customer responses stating that none of their purchases from other domestic sources were imported. Admin.

Rec. at 12, 16-17, 19. On remand, Labor will have the opportunity to reconsider the adequacy of the record here and the credibility of the responses received. Cf. Former Employees of Kleinerts, Inc., 23 CIT at 652-53, 74 F. Supp. 2d at 1286-87 (finding Labor's reliance on unverified responses reasonable because the evidence on the record did not conflict with the responses).

### IV. Conclusion

In accordance with the foregoing, it is hereby **ORDERED** that Labor's negative eligibility determination is remanded for Labor to further investigate whether increased imports contributed importantly to the separation of Plaintiffs from their employment in accord with the Court's opinion; and it is further **ORDERED** that the issue of the relevant period is remanded for investigation and explanation in accord with the Court's opinion; and it is further **ORDERED** that Labor further investigate and explain the effects of price in its contributed importantly determination in accord with the Court's opinion.

_____
Donald. C. Pogue
Judge

Dated:    January 28, 2003
          New York, New York