**Slip Op. 04-106**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| FORMER EMPLOYEES OF SUN APPAREL OF TEXAS, ROSA TUCKER, RODOLFO BRICENO, DIANA CASTRO, DIANA SANDOVAL, and REFUGIO GARCIA, | : : : : : : | |
| Plaintiffs, | : : | Court No. 03-00625 |
| v. | : : : | **PUBLIC VERSION**[*] |
| UNITED STATES SECRETARY OF LABOR, | : : : | |
| Defendant. | : : | |

[Plaintiff's motion for judgment on the agency record granted in part. Action remanded to defendant for further proceedings.]

Dated: August 20, 2004

<u>Texas Rural Legal Aid, Inc.</u> (<u>Carmen E. Rodriguez</u>) for plaintiffs.

<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Jeanne E. Davidson</u>, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Stephen Finn</u>), <u>Stephen Jones</u>, Office of the Solicitor Division of Employment & Training Legal Services, United States Department of Labor, of counsel, for defendant.

## <u>OPINION</u>

**RESTANI, Chief Judge:** Former Employees of Sun Apparel of Texas, Rosa Tucker,

Rodolfo Briceno, Diana Castro, Diana Sandoval, and Refugio Garcia ("Plaintiffs") appeal from

negative determinations of the United States Department of Labor ("Labor") regarding their

---

[*] Business confidential information has been deleted from the public version of this opinion where indicated by brackets.

eligibility for Trade Adjustment Assistance ("TAA") benefits.[1]  See Negative Determ. Regarding

Eligibility to Apply for Worker Adjustment Assistance, TA-W-51,120 (Dep't Labor Apr. 7,

2003), P.R. Doc. 22 [hereinafter Negative Determination]; Notice of Determs. Regarding

Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment

Assistance, 68 Fed. Reg. 20,176, 20,177 (Dep't Labor Apr. 24, 2003); Notice of Determs.

Regarding Application for Reconsideration, P.R. Doc. 34 (Dep't Labor July 1, 2003), published

at 68 Fed. Reg. 41,847 (Dep't Labor July 15, 2003) [hereinafter Reconsideration Determination].

Sun Apparel filed the petition on behalf of its former employees, but, based on information

gleaned from the petition and the company's human resources manager, Labor determined that

the workers did not meet the statutory criteria for eligibility.[2]  Negative Determ., at 3.  Upon

reconsideration, Labor further investigated Plaintiffs' contentions that Sun Apparel laid off its

U.S. workers in order to transfer production to Mexico, but the agency affirmed its previous

determination that the layoffs were not attributable to a shift in production or increased imports.[3]

---

[1]  Under the TAA program, workers who are displaced as a result of import competition from, or shifts in production to, the United States's trading partners are eligible for a variety of benefits to provide them with "the new skills necessary to find productive employment in a changing American economy."  Former Employees of Chevron Prods. Co. v. United States Sec'y of Labor, 245 F. Supp. 2d 1312, 1317 (Ct. Int'l Trade 2002) (quoting S. Rep. No. 100-71, at 11 (1987)) ("FEO Chevron").

[2]  In separate proceedings, Labor certified workers producing jeans and laundering jeans at Sun Apparel's Armour Facility for TAA benefits.  Notice of Determs. Regarding Eligibility to Apply for Worker Adjustment Assistance and NAFTA Transitional Assistance, 65 Fed. Reg. 2432, 2433 (Dep't Labor Jan. 14, 2000).

[3]  As discussed infra, Labor certified Sun Apparel's Print Shop employees for TAA eligibility upon reconsideration, after finding that there was in fact a shift in production of like or directly competitive articles from Sun Apparel's El Paso facility to Mexico.  Labor denied certification for all other workers at that facility.  Reconsideration Determ., 68 Fed. Reg. at

(continued...)

Reconsideration Determ., 68 Fed. Reg. at 41,847–48. For the reasons that follow, the court

concludes that Labor's determinations are not supported by substantial evidence on the record

and that good cause exists to remand this action to Labor for further investigation.

## BACKGROUND

Plaintiffs are former employees of Sun Apparel of Texas, Inc., Armour Facility, located in

El Paso, Texas.[4] Plaintiffs were employed in various positions related to the production of

sample garments. As a result of layoffs in the company, a number of petitions for worker

adjustment assistance were filed by and on behalf of the former employees.[5] At issue here is

---

[3](...continued)
41,848.

[4] Sun Apparel had two other facilities in El Paso. Its Warehouse Facility included
laundry workers, workers producing trim for clothing, and administrative staff. Workers at the
Goodyear Facility were forklift operators and shipping and receiving clerks. Negative Determ.,
at 2. Labor investigated the former employees' claims for all three facilities concurrently and
issued joint determinations. See id. at 2–3; Reconsideration Determ., 68 Fed. Reg. at 41,847–48.
The discussion herein, however, is confined to the facts and determinations relevant to the
present appeal.

[5] For example, workers in the Armour Facility's cutting room and laundry facility—who
were directly involved in the production of jeans—were certified for TAA benefits in 2000 due
to a shift in production to Mexico. See infra n.12 and accompanying text. Another group of
former employees, who apparently worked in similar roles as Plaintiffs but lost their jobs in
August 2002, petitioned for NAFTA-TAA benefits, but their petition was denied after Labor
determined that there had been no shift in production or increased imports of patterns from
Mexico. Petition for NAFTA-TAA (Aug. 30, 2002), P.R. Doc. 2; Negative Determ. Regarding
Eligibility to Apply for NAFTA-Transitional Adjustment Assistance (Dep't Labor Oct. 8, 2002),
at 2, P.R. Doc. 7. Under the statutory regime at that time, workers who were displaced as a result
of increased imports or shifts in production to Canada or Mexico filed for "transitional
adjustment assistance" under the NAFTA-TAA program, while the traditional TAA regime was
limited to providing benefits to workers displaced due to increased imports alone. See Former
Employees of Barry Callebaut v. Chao, 357 F.3d 1377, 1379 n.1 (Fed. Cir. 2004) ("FEO Barry
Callebaut"). The workers' request for reconsideration in the earlier NAFTA-TAA case was
rejected by the agency as untimely filed, see infra n.9, and they never appealed the negative
(continued...)

petition TA-W-51,120, which was filed by Sun Apparel's human resources ("HR") manager on behalf of approximately 243 workers allegedly displaced on March 3, 2003. Petition (Jan. 8, 2003), at 1, P.R. Doc. 11. In her petition, the HR manager indicated that the displaced workers produced men's and junior's jeans,[6] but she stated that job losses were not due to a shift in production to a foreign company or increased imports. Id.

Labor instituted its investigation of Sun Apparel's petition on March 11, 2003. Investigations Regarding Certifications of Eligibility To Apply for Worker Adjustment Assistance, 68 Fed. Reg. 16,095, 16,095–96 (Dep't Labor Apr. 2, 2003). In order to determine whether increased imports or a shift in production contributed to the layoffs, Labor sent Sun

---

[5](...continued)
determination to this court.

Also in August 2002, the TAA statute was amended and the NAFTA-TAA statute was repealed. Id. As amended, the TAA statute contains provisions essentially identical to the repealed NAFTA-TAA provision, except that it is not limited to increased imports or shifts in production to Canada or Mexico. Id. In addition, the new TAA statute allows certification of "secondary workers," i.e., those whose firms are or were downstream producers or suppliers to firms whose employees were certified for TAA benefits. Id.; see infra n.19 (defining "downstream producer" and "supplier").

Plaintiffs, who were displaced in 2003, filed for TAA benefits under the new TAA program. The administrative record in this case contains the entire record from the 2002 NAFTA-TAA investigation, because those workers performed similar functions as Plaintiffs and Labor considered those materials in making the determinations at issue. As a result, Plaintiffs' challenges to the contents of the record in this case must fail. In certifying and filing the administrative record on appeal, Labor must include all evidence the agency considered in reaching its conclusions. See, e.g., Defenders of Wildlife v. Dalton, 24 CIT 1116, 1118 (2000) ("[T]he 'whole' administrative record has come to be seen as 'all documents and materials directly or indirectly considered by agency decisionmakers and includes evidence contrary to the agency's position.'"), aff'd sub nom. Defenders of Wildlife v. Hogan, 330 F.3d 1358 (Fed. Cir. 2003), cert. denied, 124 S. Ct. 2093 (2004).

[6] A confidential document completed by Labor near the time of initiation similarly indicated that the affected workers produced jeans, but it stated that the layoffs occurred at a later date. See Petition Screening & Verification Guide (Mar. 17, 2003), at 2, C.R. Doc. 16.

Apparel's HR manager a business confidential data request, seeking information regarding the

organizational structure of the firm, layoffs, recent declines in either sales or production,

shutdowns, shifts in production, increases in imports, as well as sales, production, and worker

data for 2001 and 2002.  Fax to HR Manager (Mar. 17, 2003), P.R. Doc. 17.  Labor did not seek

information concerning 2003, although the layoffs had allegedly occurred in March of that year.

The HR manager responded to the confidential data request as well as to several follow-up

questions transmitted to her via e-mail.[7]

---

[7] In the business confidential data request, the HR manager indicated that [
                                                        ] and that [
            ], but claimed that [


                                        ].  Response from HR Manager (Apr. 1, 2003), at 1, C.R. Doc.
18.  That form did not state the impacted article; ostensibly, it should have related to men's and
junior's jeans, the impacted article according to the company's petition.  Sun Apparel also
provided annual data on its production and salaried workers.  The data provided by the company
indicated that there were [      ] production workers in 2001 and [      ] in 2002.  For the period
of January through October of 2001, there were [      ] production workers, compared with
[      ] for the same period one year later.  Salaried workers only decreased by [        ] between
2001 and 2002 as a whole, but decreased from [      ] to [      ] for the January – October period
in those years.  Id. at 3.
        On April 1, 2003, Labor's investigator sent some follow-up questions to the HR manager
seeking to clarify the organizational structure of each of the three El Paso facilities.  Follow-up
Questions (Apr. 1, 2003), at 1, P.R. Doc. 19.  Specifically, Labor inquired: (1) "What does [sic]
all three of these facilities do?"; (2) "How many workers at each facility?"; (3) "Which of the
three facilities are closing?"; and (4) "Are the numbers you provided me (sales/production) etc.,
for ALL facilities or just the 11201 Armour facility?"  Id.  Sun Apparel explained that the
Armour Facility [
      ].  Follow-up Response (Apr. 1, 2003), at 1, C.R. Doc. 20.  In response to Labor's request for
worker data for each facility, the HR manager indicated that only [      ] total workers were
employed at all three facilities, which was significantly fewer than the number of production
workers alone in 2002:  the Armour Facility employed [      ] workers, the Sun Warehouse
Facility, [                                                        ], and [      ] workers were
employed at the Goodyear Facility.  Id.  The HR manager did not indicate the time frame for
                                                                                    (continued...)

Meanwhile, on March 14, 2003, a group of former employees of Sun Apparel's Armour Facility filed their own petition for TAA benefits with the Texas Workforce Commission. Workers' Petition (Mar. 14, 2003), at 2, P.R. Doc. 14. Their petition alleged that 450 workers who were engaged in the production of sample garments at the facility were displaced because Sun Apparel shifted production of samples to an affiliated facility in Durango, Mexico. The petition also alleged that the Armour Facility was closing. Id. A letter accompanying the workers' petition from the Sun & Jones Apparel Workers Committee, a group of displaced employees, indicated that they sought reconsideration of Labor's October 2002 denial of their NAFTA-TAA petition or, in the alternative, the initiation of a new petition. Id. at 3–4; see supra n.5 (describing prior NAFTA-TAA investigation). The workers claimed that, prior to June of 2002, Sun Apparel had more than one thousand workers employed in El Paso, but that employees were gradually dismissed as the company transferred its operations to Mexico. Workers' Petition, at 3. In addition, the workers alleged that, at the end of 2002, El Paso employees were sent to train personnel in Mexico, and that personnel from Mexico were similarly sent to El Paso to receive training. Id. Finally, the workers shed more light on sample production at the Armour Facility:

> This department of the company is the initiator and terminator of a product. Textiles are designed, cut, sewn, washed, dried, ironed, packaged, and then sent [to the end user]. Hundreds of samples are sold to different parts of the country, so that production of thousands of these samples can also be done in Mexico.

Id. at 4. The Texas Workforce Commission transmitted the petition and letter to Labor via fax

---

[7](...continued)
these employment data numbers and did not separate the figures by salaried and production workers. See id.

on March 21, 2003. Id. at 1. Less than one week later, the Assistant General Counsel of the

Texas Workforce Commission forwarded nine letters written in Spanish by individual displaced

workers in support of their petition/reconsideration request. Letter from Comite de Sun-Jones

Apparel with Attachments (Mar. 20, 2003), at 4, 7, & 8–17, P.R. Doc. 25. As in the earlier letter

sent by the Sun & Jones Apparel Workers Committee, the letters by the individual workers

alleged that their jobs associated with the production of samples were transferred to Mexico by

Sun Apparel. Id. at 8–17. Labor never acknowledged receipt of the petition, never published any

notices in the Federal Register, and failed to initiate an investigation of the employees' claims.

Approximately two and a half weeks later, on April 7, 2003, Labor issued a negative

determination on Sun Apparel's petition for TAA benefits. Negative Determ., at 3. Rather

inexplicably, Labor stated that "[t]he workers at the Armour Facility firm produce patterns."[8] Id.

---

[8] Nothing in the record specifically related to TA-W-51,120 contains any reference to pattern production at the Armour Facility. In fact, as discussed supra, the company had indicated in its petition on the workers' behalf that men's and junior's jeans were produced at the facility. The workers' uninitiated March 14, 2003 petition, by contrast, claimed that the affected workers produced sample garments. A confidential document in the 2002 NAFTA-TAA investigation, however, contains some evidentiary support for Labor's conclusion. See Letter from Jacquelynn I. Dayton, Texas Workforce Commission to U.S. Department of Labor to Labor (Sept. 25, 2002), at 3, C.R. Doc. 5. An employee for the Texas Workforce Commission wrote to Labor that, on September 26, 2002—some time after the NAFTA-TAA investigation was initiated and Sun Apparel completed the confidential data request form—the company's HR manager stated by telephone that patterns for jeans are produced at the Armour Facility for use in jean production at a facility in Mexico. Id. The Texas official subsequently updated Sun Apparel's confidential data request form in the NAFTA-TAA investigation to reflect this new information, but only in a "comments" section. Id. at 3. The company data as to sales, production, workers, etc. were not changed. Id.

Relying upon the HR manager's new representations, the negative determination in that case found that the former employees of the Armour Facility "were engaged in the development of patterns used to produce jeans." Negative Determ. Regarding Eligibility To Apply for NAFTA-Transitional Adjustment Assistance, NAFTA-6530 (Dep't Labor Oct. 8, 2002), at 2,

(continued...)

at 2.  Further, while the record in TA-W-51,120 contained no evidence to support its findings, Labor nevertheless determined that Sun Apparel did not increase its imports of jean patterns and did not shift production of patterns abroad.  Id. at 3; see supra n.8.  Accordingly, Labor denied Sun Apparel's petition for eligibility to apply for worker adjustment assistance.  Negative Determ., at 3.  As shown, the agency's negative determination wholly ignored the allegations made in the workers' March 14, 2003 petition and accompanying letters.[9]

Subsequently, the former employees, apparently under the mistaken belief that their own petition had been investigated and denied, requested reconsideration of Labor's negative determination by letter dated May 22, 2003.  Letter from Former Employees to Timothy F. Sullivan, Director, Division of Trade Adjustment Assistance, Employment and Training Administration (May 22, 2003), at 1–2, P.R. Doc. 29 ("Reconsideration Request").  In their request, the workers made new factual allegations in support of their claim that production had in fact shifted to Mexico.  They alleged that not only did they produce sample garments at the Armour Facility, but that they also produced articles for the Polo Ralph Lauren trademark, and

---

[8](...continued)
P.R. Doc. 7 [hereinafter NAFTA-TAA Determination].  Labor denied the petition because "[t]he investigation revealed that there was no shift in plant production to Canada or Mexico or company imports of patterns from Canada or Mexico during the relevant period."  Id.  The HR manager's oral statement, however, is the only evidence in the record supporting Labor's conclusions there; there was no evidence that Labor actually investigated whether imports of patterns or a shift in production of patterns abroad contributed to the layoffs.

[9]  While Labor's negative determination in the TAA investigation failed to respond to the substantive allegations in the employees' March 2003 petition and letters, Labor did eventually deny as untimely the employees' alternative request for reconsideration of the NAFTA-TAA determination.  Letter from Elliott S. Kushner, Certifying Officer, U.S. Dep't of Labor, Division of Trade Adjustment Assistance to Sun & Jones Workers Committee (Apr. 28, 2003), P.R. Doc. 27.

that their jobs were transferred to a Sun Apparel facility in Durango, Mexico, over an extended period of time.  Id.

Eight individual employees also submitted reconsideration requests in May of 2003.[10]  Id. at 3–10.  Plaintiff Rosa Tucker alleged in a letter that she produced sample garments that were shipped to customers in Mexico, Japan, and Canada.  Id. at 3.  Other employees stated that, in addition to pants for the Polo mark, the workers at the Armour Facility produced Just My Size, Faded Glory, and Quick Silver articles, among others, through most of 2002, but that production had virtually ceased by March of 2003.  Id. at 4, 8.  This allegation was corroborated by another letter reporting that, in early March 2003, at least 40 workers were laid off; another former employee similarly stated that employment had dropped at the Armour Facility from approximately 1000 workers in 2002 to approximately 150 employees as of March 3, 2003.  Id. at 6–7.  Labor did not respond to the reconsideration requests submitted by the former employees in May.

The former employees reiterated their request for reconsideration in June.  Two workers, including Plaintiff Tucker, sent Labor a letter on June 10, 2003.  Letter Regarding Reconsideration Request (June 10, 2003), at 1–2, P.R. Doc. 30.  They alleged that "massive" layoffs began at the Armour Facility in early 2000.  They explained that they not only produced sample jeans and pants, but also jackets, dresses, skirts, overalls, shirts, and shorts that were distributed to various customers in the United States, such as Mervyn's, Wal-Mart, and Big K-

---

[10]  While the original letters were written in Spanish, translated versions were supplied by the Government in an appendix to their brief in opposition of Plaintiff's motion for judgment on the agency record.

Mart. Id. at 1. The workers described various departments involved in the production of sample garments, including pattern making, cutting, sewing, laundry, packing, and shipping. They also explained how the trim department performed auditing functions for articles produced both in El Paso and in Mexico. Id. A letter written by a former supervisor on June 11, 2003 elaborated that approximately 1000 production workers had been laid off by Sun Apparel since July 2002. Reconsideration Request, at 10. The former employees reiterated their request that Labor reconsider its negative TAA determination in order to help them obtain job training and other benefits.

After obtaining the employees' repeated requests for reconsideration, Labor finally initiated an investigation into Plaintiffs' claims. On June 17, 2003, Labor wrote two e-mails to Sun Apparel's HR manager and asked her the following four questions: (1) whether the workers at the Armour Facility produced jeans after January 8, 2002 and, if so, what percentage of the work was devoted to this production; (2) whether the workers produced "articles" of any kind for Ralph Lauren, Polo; (3) whether the workers produced anything other than apparel samples; and (4) whether the workers sewed labels on apparel after January 8, 2002. Questions from Susan Worden to Tina Montes (June 18, 2003), at 1, C.R. Doc. 31 ("Questions"); Follow-up Questions and Responses from Susan Worden to Tina Montes (June 23, 2003), at 2, C.R. Doc. 32 ("Follow-up Questions & Responses"). The HR manager responded that the facility only produces patterns and markers for cutting in Mexico "which [are] shipped primarily via electro[n]ic dat[a] interface," as well as samples and production approval garments. Questions, at 1. Regarding sewing, the HR manager stated that [

]. Follow-Up Questions & Responses, at 2. The following day, Labor

followed up with several additional questions, including a request for the HR manager to amend

or add to a list of comprehensive work functions performed by workers at the Armour Facility, a

list that was generated by Labor.[11] Id. at 1–2. Significantly, Labor characterized the

pattern/marker production as "electronically generated and sent to Mexico in this form," which

the HR manager did not amend, despite her more limited previous statement that these products

were only primarily shipped electronically. Compare Questions (emphasis added) with Follow-

up Questions & Responses. These e-mail exchanges constituted the full extent of Labor's

investigation into the workers' claims.

Labor officially granted the workers' request for reconsideration and issued its

Reconsideration Determination on July 1, 2003. 68 Fed. Reg. at 41,847. Labor found that the

workers at the Armour Facility produced patterns and markers used to manufacture jeans at an

affiliated plant in Mexico, as well as samples (also known as "production approval garments")

produced for a variety of domestic customers. Reconsideration Determ., 68 Fed. Reg. at 41,847.

Because Labor found that the patterns and markers "were electronically generated and

transmitted," Labor concluded that there was no "production" of those articles as required by the

statute. Id. With respect to the sample production that has ceased at the Armour Facility, Labor

found that "sample production has never occurred at the Mexican affiliate, so no production of

---

[11] Labor also asked for clarification on functions performed at the facility's print shop. In her response, the HR manager admitted that the print shop was running both in El Paso and in Mexico, but that the company elected to eliminate positions in El Paso starting in August 2002. She stated that the print shop closed on March 28, 2003. Response from Tina Montes (June 23, 2003), at 1, C.R. Doc. 33. As discussed infra, the print shop employees were eventually certified as eligible to apply for TAA benefits.

samples was shifted. Further, the company does not import samples. (As samples are produced for internal use, there is no issue in regard to customer imports.)" Id. The agency also found that the workers employed in the shipping and receiving facility, as well as employees in the Trim Department, performed services "mainly" for articles produced at a Mexican production facility. Id. at 41,847–48. While Labor acknowledged that service workers can be certified for TAA under limited circumstances, the agency did not analyze whether Sun Apparel's service workers fit the criteria or draw any specific conclusions on their eligibility as service workers. See id. at 41,848. Next, Labor noted the employees' allegations that they trained workers in similar functions as those performed at the Armour Facility and that they performed regular production of apparel for specific customers, but stated that a company official reconfirmed "that the subject facility produces apparel for sample purposes only and that all other apparel production was shifted from the subject facility in 2000."[12] Id. Because print shop production had ceased in El Paso and production of like or directly competitive articles was shifted to Mexico, however, Labor determined that former print shop employees had met the criteria for eligibility for TAA benefits. Id. All other workers, however, were denied eligibility to apply for worker adjustment assistance based on Labor's conclusion that neither increased imports nor a shift in production contributed importantly to their separation from Sun Apparel. Id.

---

[12] Labor noted that workers producing jeans and laundering jeans at the Armour Facility were previously certified for TAA on July 7, 2000. At that time, a company official had confirmed that all mass production of apparel had shifted from the subject facility to Mexico. Reconsideration Determ., 68 Fed. Reg. at 41,848. Because that shift occurred outside the period of investigation, Labor stated that it could not be used to certify the current group of displaced workers. Id.

**JURISDICTION AND STANDARD OF REVIEW**

Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (2000).  The agency's determination must be sustained if it is supported by substantial evidence in the administrative record and is otherwise in accordance with law.  See 19 U.S.C.A. § 2395(b) (West Supp. 2004).  While the Secretary of Labor's findings of fact are conclusive if supported by substantial evidence, the court may remand the case and order the Secretary to further investigate for "good cause shown." Id.

**DISCUSSION**

Plaintiffs are eligible to apply for trade adjustment assistance if Labor determines that the statutory criteria are met.  19 U.S.C.A. § 2272 (West Supp. 2004).  First, Labor must determine that a significant number or proportion of the workers at Sun Apparel have become, or are threatened to become, totally or partially separated.  Id. § 2272(a)(1).  Second, Labor must find that one of the following has occurred:  (1) Sun Apparel's sales, production, or both have decreased absolutely, that imports of "articles" like or directly competitive with articles produced by Sun Apparel have increased,[13] and that the increase in imports "contributed importantly"[14] to

---

[13]  The term "article" is not statutorily defined.  The court has used the term "product" interchangeably with "article."  See, e.g., Former Employees of Henderson Sewing Machs. v. United States Sec'y of Labor, 265 F. Supp. 2d 1346, 1358 (Ct. Int'l Trade 2003).  The court has similarly explained that "TAA was intended to benefit those who ha[ve] been engaged in the production of an import-impacted article, and courts have noted the common meaning of 'production,' i.e., to 'give birth, create or bring into existence.'" Former Employees of Pittsburgh Logistics Sys., Inc. v. United States Sec'y of Labor, 2003 WL 716272, at *5 (Ct. Int'l Trade Feb. 28, 2003) (citing Woodrum v. Donovan, 5 CIT 191, 198, 564 F. Supp. 826, 831 (1983), aff'd sub nom. Woodrum v. United States, 737 F.2d 1575 (Fed. Cir. 1984)).  "[I]t is . . . clear that 'mere' repair and maintenance on an existing article, or work that does not involve transformation of a thing into something 'new and different,' will not suffice for TAA eligibility." Id. (citing Nagy

(continued...)

the workers' separation and to such decline in sales or production; or (2) Sun Apparel shifted

production of articles like or directly competitive with the articles produced by Sun Apparel's

Armour Facility to Mexico. Id. § 2272(a)(2). There is no dispute that a significant number of

workers at Sun Apparel have become totally or partially separated or that sales or production

have decreased absolutely. Accordingly, the sole issue is whether there is substantial evidence in

the administrative record to support Labor's determination that neither a shift of production nor

increased imports of like or directly competitive articles contributed to the layoffs at Sun

Apparel's Armour Facility in March 2003.

In their motion for judgment upon the agency record, Plaintiffs argue that the court

should certify them for TAA benefits or, in the alternative, remand the case to Labor for further

investigation. Plaintiffs first attack the record and investigation in this matter because the agency

wholly failed to initiate an investigation of their petition for TAA benefits and instead relied

upon evidence collected in other investigations. Plaintiffs also argue that the investigation was

inadequate because Labor relied solely upon the unverified information provided by one

individual, Sun Apparel's HR manager, who they claim gave incomplete, contradictory, and

inconsistent statements throughout several investigations and upon reconsideration. Plaintiffs

also point out that Labor drew broader conclusions from the information provided than the

evidence supports. Finally, the former employees claim that the time period covered in the

---

[13](...continued)
v. Donovan, 6 CIT 141, 145, 571 F. Supp. 1261, 1264 (1983)).

[14] This term "means a cause which is important but not necessarily more important than
any other cause." 19 U.S.C. § 2272(c)(1).

agency's investigation is insufficient to discern the gradual shift in production occurring at the Armour Facility.

The Government responds that there is substantial evidence on the record to support Labor's determination and that, accordingly, the determination should be sustained. The Government heralds the breadth of the administrative record, which includes information obtained from several investigations into job losses at Sun Apparel's El Paso facilities, as sufficient to support the negative TAA determination, despite Labor's failure to initiate a separate investigation into Plaintiffs' petition. Further, Defendant asserts that Labor's reliance on the data provided by Sun Apparel's HR manager was appropriate given her credibility and position within the company and that, based on the information she provided, it is clear that pattern and sample production did not shift to Mexico and that Sun Apparel did not import patterns and samples. Thus, the Government concludes that the court should deny Plaintiffs' motion for judgment upon the agency record and sustain Labor's negative TAA determination.

While Labor has "considerable discretion" in conducting its investigation of TAA claims, "there exists a threshold requirement of reasonable inquiry. Investigations that fall below this threshold cannot constitute substantial evidence upon which a determination can be affirmed." FEO Chevron, 245 F. Supp. 2d at 1318 (quoting Former Employees of Hawkins Oil & Gas v. United States Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993)). The court has comprehensively reviewed the administrative record in this manner and agrees with the Plaintiffs that good cause exists to remand this case to Labor for further investigation.[15] As an initial

---

[15] Accordingly, the court will not reach the issue of whether the Court of International

(continued...)

matter, the court notes that the agency's failure to respond in any way to the former employees' petition for TAA benefits was not in accordance with law. The statute requires the Secretary of Labor to "promptly publish notice in the Federal Register that the Secretary has received the petition and initiated an investigation." 19 U.S.C.A. § 2271(a)(3) (West Supp. 2004). It is undisputed here that Labor never acknowledged its receipt of Plaintiffs' petition and wholly failed to initiate an investigation thereof. While it is true that Labor was investigating a petition filed on the workers' behalf by Sun Apparel at or around the same time the workers' petition was filed, and that the workers' allegations were eventually considered by the agency upon reconsideration of its initial Negative Determination, Labor is under a mandatory duty to "conduct an investigation into each properly filed petition" and to publish the notice required by statute. Woodrum v. Donovan, 4 CIT 46, 51, 544 F. Supp. 202, 205–06, rehr'g denied 4 CIT 130 (1982). The error was prejudicial to Plaintiffs. See id. (finding that Labor's failure to comply with these procedural requirements of the statute "prejudiced the rights of plaintiffs" and remanding the action for further proceedings in conformity with statutory requirements).

Due to Labor's disregard of its statutory duty, the displaced workers' claims were ignored for over three months while the agency completed its investigation into Sun Apparel's petition and issued its negative determination. The entire investigation consisted of two communications with only one individual, Sun Apparel's HR manager. In response to Labor's business confidential data request seeking data from Sun Apparel for 2001 and 2002 and one follow-up e-mail, the HR manager provided information that Labor failed to verify or otherwise corroborate.

---

[15](...continued)
Trade is empowered to order the Secretary to certify Plaintiffs for TAA benefits.

See supra n.7. Such a limited investigation fails to provide substantial evidence upon which

Labor could base its determination, because, as discussed infra, the information provided by the

HR manager was too incomplete and unreliable upon which to base a negative determination.

See Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 370 F.3d 1375, 1385 (Fed.

Cir. 2004) ("The Secretary is entitled to base an adjustment assistance eligibility determination

on statements from company officials," but only "if the Secretary reasonably concludes that those

statements are creditworthy and are not contradicted by other evidence."); FEO Barry Callebaut,

357 F.3d at 1383 (holding that sworn affidavits supplied by three members of management "were

sufficiently trustworthy to constitute substantial evidence").

The information provided by Sun Apparel's HR manager regarding the work performed

at the Armour Facility was inconsistent, contradictory, and evidences an apparent lack of

comprehension of the full array of operations, tasks, and activities undertaken by Sun Apparel's

former employees. For example, in the petition that she filed on the workers' behalf in 2003, the

ultimate determination of which is at issue here, the HR manager stated that the articles produced

at the facility were men's and juniors' jeans. It follows that the data she provided in the sole data

request form likely was based on those affected products, not sample or pattern production.[16] See

supra n.7. Further, while the nature and extent of Labor's investigation are matters within the

agency's discretion, FEO Chevron, 245 F. Supp. 2d at 1318, Labor only investigated Sun

Apparel's activities in 2001 and 2002. The court agrees with Plaintiffs that the limited extent of

---

[16] The data request form does not include the article at issue, so it is ostensibly based upon the article listed in the petition. Here, the company's petition stated that men's and juniors' jeans were the products produced by the affected worker group. Petition, at 1.

the investigation failed to provide substantial evidence to support Labor's findings regarding the March 2003 layoffs at the Armour Facility. As a result, the court finds that the information Labor obtained from Sun Apparel's HR manager provides limited, if any, support for Labor's Negative Determination in this matter, and it was unreasonable for the agency to conclude otherwise.[17]

In addition to providing contradictory and irrelevant information, the confidential data request form completed by Sun Apparel's HR manager during Labor's initial investigation was incomplete. The manager failed to fill out an entire section of the form regarding the organizational structure of the firm, specifically Sun Apparel's parent companies and affiliates, including those that manufacture products similar to those made at the Armour Facility. Had the HR manager completed this section, the response would have provided crucial data regarding the relationship between the El Paso and Durango, Mexico facilities and the articles produced at each.[18] Labor issued its Negative Determination without investigating these issues. Accordingly,

---

[17] Although there was some evidence in the record of the workers' prior NAFTA-TAA investigation that the Armour Facility produced patterns that were used to produce jeans in Mexico, there was no evidence whatsoever regarding the pattern production process. See supra n.8. In this investigation, the HR manager only admitted that patterns, markers, and sample garments were produced at the Armour Facility in response to an e-mail upon reconsideration regarding the specific functions of each of Sun Apparel's El Paso facilities. As a result, the information in the record at the time of Labor's Negative Determination was largely irrelevant to a determination on the workers' claims that their jobs in sample production were shifted to Mexico.

[18] Such information might have shown that Sun Apparel's workers qualify as adversely affected secondary workers. See supra n.5 (defining "secondary workers"). A "downstream producer" is "a firm that performs additional, value-added production processes for a firm or subdivision, including a firm that performs final assembly or finishing, directly for another firm (or subdivision), for articles that were the basis for a certification of eligibility" for the primary

(continued...)

the court concludes that the initial investigation into Plaintiffs' eligibility for TAA benefits was inadequate because it was based upon incomplete and unreliable data, which resulted in a determination that reached the unsupported conclusion that the affected workers produced only patterns. See supra n.8 and accompanying text. Such an investigation does not meet the threshold requirement of "reasonable inquiry" or comport with Labor's duty to conduct itself with the "utmost regard" for the petitioning workers. See FEO Chevron, 245 F. Supp. 2d at 1318; Miller v. Donovan, 9 CIT 473, 477, 620 F. Supp. 712, 717 (1985).

The record reflects significant confusion on the part of the workers as to the status of their petition and, ultimately, the workers were forced to appeal the company's petition once it was denied. It was not until the agency finally granted Plaintiffs' repeated requests for reconsideration that, upon further investigation, Labor was able to more fully define the articles produced at Sun Apparel's Armour Facility and investigate whether the statutory criteria was met for those products. Nevertheless, the investigation upon reconsideration was perfunctory at best.

In its investigation of the numerous new allegations raised by the former employees, Labor asked the HR manager only eight questions, which yielded the following new information from the company: (1) Sun Apparel is a division of Jones Apparel Group, Inc., a Pennsylvania corporation; (2) it is both a manufacturer and contractor (although details regarding the articles

---

[18](...continued)
workers. 19 U.S.C. § 2272(c)(3). A "supplier" is "a firm that produces and supplies directly to another firm (or subdivision) component parts for articles that were the basis for a certification for eligibility." Id. § 2272(c)(4).

manufactured and the work performed under contract were not provided);[19] (3) the displaced

workers at the Armour Facility have never manufactured retail jeans; (4) Armour employees

produced only salesman samples and/or production approval garments as well as patterns and

markers used for cutting in Mexico, which are "shipped primarily" via electronic data interface;

and (5) the workers on the sample sew line also did miscellaneous repair work (including sewing

labels) on inbound shipments from Mexico. Questions, Follow-up Questions, & Responses, C.R.

Docs. 31–33. Labor failed to require any documentary or other evidence to support the HR

manager's assertions, to verify the company's responses, or to otherwise ensure the truthfulness

of the HR manager's claims. Because the HR manager's statements were directly contradicted

by the employees' allegations—for example, that they produced articles for specific clothing

brands, not just samples and patterns, and that production of these articles had in fact shifted to

Mexico—Labor was required to further investigate these issues. See FEO Chevron, 245 F. Supp.

2d at 1325 ("[T]he inconsistency between the statements of the [workers] and statements of the

company official alone would have necessitated further agency investigation of the precise nature

of the [employees'] work."). Further, while there is no dispute that Sun Apparel's facilities in

Mexico produce jeans, there is no evidence in the record that Labor made any inquiries

whatsoever into other articles produced at the facility or whether Sun Apparel or its customers

imported patterns or sample garments. Thus, like the initial investigation, the investigation upon

reconsideration fell below the benchmark standard of "reasonable inquiry" in light of the former

employees' allegations. See id. at 1318, 1325–26 (holding that it was unreasonable for Labor to

---

[19] The company is a manufacturer for [                                        ] and is a contractor for [              ]. Follow-up Questions & Responses, at 1.

rely on the unverified statements of a HR manager when contradicted by the workers' descriptions of their own jobs).

As a result of the deficiencies in the investigation upon reconsideration, the court holds that there is insufficient evidence in the record to support Labor's findings that (1) "patterns and markers . . . were electronically generated and transmitted, and thus do not constitute production," (2) "sample production has never occurred at the Mexican affiliate, so no production of samples was shifted," (3) "the company does not import samples," (4) samples are produced for internal use, with no effect on imports for customers, and (5) "the subject facility produces apparel for sample purposes only and that all other apparel production was shifted from the subject facility in 2000." Reconsideration Determ., 68 Fed. Reg. at 41,847. Regarding pattern and marker production, while the company stated that patterns and markers were "shipped primarily" via electronic means, Labor made the much broader conclusion that the patterns and markers were generated and shipped electronically and, on the basis of this finding, Labor summarily concluded that no "production" occurred. There is insufficient evidence to support this conclusion. Labor also failed to make basic inquiries into these items to determine if they were in fact articles under the TAA regime or whether increased imports or a shift in production of patterns contributed to Plaintiffs' displacement.[20] The record is also devoid of any

_____

[20] While it is true that the HR manager failed to correct Labor's characterization of pattern and marker production in a list generated by Labor, Labor failed to make any inquiries into the process. Labor failed to ask questions such as: What actual work was performed in order to produce a pattern at the Armour Facility? Were the workers pattern designers? In what form did the patterns exist when they were produced at Armour? What was done to a pattern in order to complete it before sending it to Mexico for use in the actual production of jeans? If the patterns were only primarily shipped electronically, what were the other means of shipment?

(continued...)

evidence to support Labor's conclusion that Sun Apparel did not shift its production of sample garments to Mexico or increase its imports of sample garments.[21] As discussed supra, Labor failed to conduct further inquiry into regular production of apparel at the Armour Facility, which it should have done in light of the contradictory allegations of the former employees. Labor also failed to investigate the nature and purpose of Sun Apparel's use of U.S. workers to train Mexican workers, the relationship between Sun Apparel and its customers, and whether the customers are now importing articles formerly produced at the Armour Facility. Finally, Labor wholly failed to conduct a meaningful review of whether Sun Apparel's service workers are eligible for TAA benefits.[22] Upon remand, Labor shall conduct a full investigation into these issues.

**CONCLUSION**

Because there is good cause to remand this case to Labor for further investigation, Plaintiffs' motion for judgment on the agency record is granted in part. Upon remand, Labor shall fulfill its affirmative obligation to conduct a full and complete investigation into the former

---

[20](...continued)
What volume of patterns was being produced or developed at Armour before the layoffs, and what volume was being produced at the time of Plaintiffs' displacement? Are workers in Mexico performing similar tasks now? If not, from where is the company getting its patterns?

[21] Labor should have determined where Sun Apparel's samples are being produced if not at the El Paso facility. Is the production of those articles now being performed at Sun Apparel's Mexican facilities? If samples are not produced in Mexico, is Sun Apparel manufacturing these articles at another domestic facility, or is the company importing like or directly competitive articles?

[22] Service workers, which are not directly engaged in the production of an article, may be eligible for TAA benefits. See Abbott v. Donovan, 6 CIT 92, 100–01, 570 F. Supp. 41, 49 (1983). Here, Labor stated that certain employees of Sun Apparel were service workers but did not analyze their eligibility for benefits as such.

employees' allegations and to reach a conclusion on Plaintiffs' eligibility for TAA benefits that is reasonable and supported by substantial evidence in the administrative record. Labor must be specific in its findings regarding the period of review and the impacted article(s) included in the scope of the investigation. A redetermination shall be filed within 45 days.

SO ORDERED.


                                                        Jane A. Restani
                                                        Jane A. Restani
                                                        Chief Judge

DATED:  New York, New York

This 20th of August, 2004.